IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

FILED
DES MOINES, IOWA
2001 JUN -6  PM 9:30
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| WENGER MANUFACTURING, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 4-98-CV-90083 |
| | ) |
| COATING MACHINERY SYSTEMS, | ) |
| INC. and VECTOR CORPORATION, | ) |
| | ) |
| Defendants. | ) |

---

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO STAY PROCEEDING PENDING REEXAMINATION

---

John M. Collins
Warren N. Williams
HOVEY, WILLIAMS, TIMMONS & COLLINS
2405 Grand Blvd., Suite 400
Kansas City, Missouri 64108
816/474-9050
816/474-9057 (FAX)

ATTORNEYS FOR PLAINTIFF

OF COUNSEL:
G. Brian Pingel
SHEARER, TEMPLER & PINGEL
3737 Woodland Avenue, Suite 437
West Des Moines, Iowa 50309
515/225-3737
515/225-9510 (FAX)

Pleading # 147



# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE REQUESTED STAY SHOULD BE DENIED BECAUSE OF THE
      ADVANCED STAGE OF THIS CASE, DEFENDANTS' UNREASONABLE
      DELAY IN SEEKING REEXAMINATION, AND THE ABSENCE OF
      DEFENDANTS' AGREEMENT TO BE BOUND BY THE RESULT OF
      REEXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   History of This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.   Defendants' Delay in Seeking Reexamination and a Stay Is Unreasonable
           in Light of Defendants' Knowledge Since 1998 of the Principal References
           Underlying the Reexamination Request and the Advanced Stage of This
           Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.   An Unconditional Stay Would Prejudice Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . 6

      D.   The Cases Cited by Defendants Do Not Support a Stay Under the Circumstances
           of This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  IF THE COURT CONCLUDES THAT A STAY IS APPROPRIATE, THE
      STAY SHOULD BE CONDITIONED SO AS TO MINIMIZE PREJUDICE TO
      PLAINTIFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

i

# TABLE OF AUTHORITIES

## Statutes & Rules

37 C.F.R. § 1.132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## Cases

*ASCII Corp. v. STD Entertainment USA, Inc.*, 844 F. Supp. 1378 (N.D. Cal. 1994) . . . . . . . . . 11

*Bausch & Lomb Inc. v. Alcon Laboratories, Inc.*, 914 F. Supp. 951 (W.D.N.Y. 1996) . . . . . . . 11

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 920 (Fed. Cir. 2000) . . . . . 8

*Brown v. Schimano American Corp.*, 18 USPQ2d 1496 (C.D. Cal. 1991) . . . . . . . . . . . . . . . . . 11

*Emhart Industries Inc. v. Sankyo Seiki Mfg. Co., Ltd.*, 3 USPQ2d 1889 (N.D. Ill. 1987) . . . . . . 10

*Fisher Controls Co., Inc. v. Control Components, Inc.*, 443 F. Supp. 581 (S.D. Iowa 1977) . . . 11

*Freeman v. Minnesota Mining and Manufacturing Co.*, 661 F. Supp. 886 (D. Del. 1987) . . . . . . 5

*Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573 (Fed. Cir. 1997) . . . . . . . . . . . . 9

*Gladish v. Tyco Toys Inc.*, 29 USPQ2d 1718, 1993 WL 625509 (E.D. Cal. 1993) . . . . . . . . . . . 10

*Grayling Industries v. GPAC Inc.*, 19 USPQ2d 1872 (N.D. Ga. 1991) . . . . . . . . . . . . . . . . . . . 11

*H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed. Cir. 1987) . . . . . . . . . . . . . 7

*Ingro v. Tyco Industries, Inc.*, 227 USPQ 69 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . 7

*Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568 (Fed. Cir. 1996) . . . . . 8

*Remington Arms Co., Inc. v. Modern Muzzleloading, Inc.*, 1998 WL 1037920
    (M.D.N.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Robert H. Harris Co. Inc. v. Metal Manufacturing Co. Inc.*, 19 USPQ2d 1786
    (E.D. Ark. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Rohm and Haas Co. v. Brotech Corp.*, 24 USPQ2d 1369, 1992 WL 313099 (D. Del. 1992) . . . . 9

*Winner International Royalty Corp. v. Wang*, 202 F.3d 1340 (Fed. Cir. 2000) . . . . . . . . . . . . . . 8

*Xerox Corp. v. 3Com Corp.*, 69 F. Supp.2d 404 (W.D.N.Y 1999) . . . . . . . . . . . . . . . . . . . . . . . . 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| WENGER MANUFACTURING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 4-98-CV-90083 |
| COATING MACHINERY SYSTEMS, INC., and | ) | |
| VECTOR CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO
STAY PROCEEDING PENDING REEXAMINATION**

## I.    INTRODUCTION

Defendants have already been adjudged to infringe the Wenger patent.  Fact discovery is closed, and the case should be ready for a short trial (2-3 days at most) on the validity and damages questions within 60-90 days.

Knowing this, defendants seek to delay final judgment by a last-minute filing of a PTO reexamination request and by asking this Court for an unconditional stay.  The prior art relied upon in the reexamination has been known and available to defendants for years, and nothing would have prevented an earlier reexamination request.  This is an abuse of the reexamination process.

The requested stay would prejudice Wenger in many ways: the term of patent monopoly would be further reduced, defendants will continue to sell infringing machines and thus increase the damages, and Wenger will be prevented from presenting highly relevant commercial success evidence in the PTO, which can and would be presented at a trial in this Court.

1

Therefore, the requested unconditional stay should be denied.

## II.   THE REQUESTED STAY SHOULD BE DENIED BECAUSE OF THE ADVANCED STAGE OF THIS CASE, DEFENDANTS' UNREASONABLE DELAY IN SEEKING REEXAMINATION, AND THE ABSENCE OF DEFENDANTS' AGREEMENT TO BE BOUND BY THE RESULT OF REEXAMINATION

### A.   History of This Case

Wenger's Complaint was filed February 12, 1998.  The parties proceeded immediately with discovery; defendants responded to Wenger's first interrogatories and document production request on March 20, 1998, and Wenger answered the first discovery inquiries of defendants on March 22, 1998.  A Scheduling Order and Discovery Plan was entered June 22, 1998, ordering discovery to be completed by December 15, 1998; the case was to be ready for trial on May 3, 1999.

On August 12, 1998, defendants filed a motion for summary judgment of noninfringement, and in October, 1998, defendants amended their answer to assert an abuse of process claim.  In subsequent proceedings, Wenger moved for summary judgment of literal infringement and dismissal of defendants' abuse of process counterclaim.  During the fall and winter of 1998-1999, a series of briefs were filed by the parties directed to these summary judgment motions.  During the same period, fact discovery ended and the parties continued to prepare for trial.  On March 1, 1999, plaintiff submitted its initial expert reports, which were followed by defendants' expert reports on April 16, 1999.  Defendants' technical expert report included opinions on alleged obviousness under § 103.  Among the prior art discussed in this expert report were the patents to Schady, Benson and Casey, all of which are relied-upon prior art references in defendants' reexamination request.  The

2

principal reference in the report was the Schady patent. A copy of defendants' technical expert report is attached as Exhibit A.[1]

On March 31, 1999, this Court issued an Order denying defendants' motion for summary judgment of noninfringement and granting plaintiff's cross-motion for summary judgment. Both parties sought reconsideration/clarification, and on September 30, 1999, this Court reversed its earlier ruling and granted defendants' noninfringement summary judgement motion.

Wenger appealed to the Court of Appeals for the Federal Circuit, which reversed summary judgment of noninfringement and granted Wenger's motion for summary judgment of literal infringement. On April 30, 2001, after this Court's receipt of the mandate from the Federal Circuit, Wenger moved for a Rule 16 conference to set a trial date and deal with other housekeeping issues.

**B.     Defendants' Delay in Seeking Reexamination and a Stay Is Unreasonable in Light of Defendants' Knowledge Since 1998 of the Principal References Underlying the Reexamination Request and the Advanced Stage of This Litigation**

Defendants' reexamination documents rely upon five prior art references. Two of these, the Benson Patent No. 3,167,035 and French Patent No. 2,502,466, were cited by the Patent Office during prosecution of the original application which matured as the patent in suit, No. 5,100,683. Additionally, another two of defendants' references, Schady Patent No. 3,934,545 and Casey Patent No. 4,639,383, were known to defendants from the very outset of this case. That is, Schady and Casey were produced in defendants' original document production in early 1998 (Bates Nos. 349-353 and 429-442, respectively). The Schady and French patents are the principal references used

---

[1]   Expert discovery was not completed, although both sides recognized the need for expert depositions and/or counter-reports. In this connection, Magistrate Walters' Order of March 30, 1999, assured the parties that "[b]oth sides may rely on the fact that they will have a fair opportunity to depose experts following the ruling on the dispositive motions."

by defendants in the reexamination request filed in the PTO. The remaining reference, Lanz Patent No. 3,101,040, issued in 1963 and has also been long available.

Accordingly, while almost all of the references have been known to defendants for over three years (and the Lanz patent was readily available), defendants have waited until this case has been through dispositive motions and an appeal and is on the eve of trial before seeking reexamination and a stay. Such an unwarranted delay is reason enough to deny the stay.

In *Xerox Corp. v. 3Com Corp.*, 69 F. Supp.2d 404, 406-07 (W.D.N.Y 1999), the defendant moved for a stay almost two years after initiation of the suit. The defendants were aware of the prior art for eight months before seeking PTO reexamination. The court exercised its discretion and denied the stay.

> In determining whether to stay litigation pending reexamination by the PTO, courts generally consider the following factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set.

> \* \* \*

> While the PTO is directed by statute to conduct reexamination proceedings with "special dispatch," 35 U.S.C. § 305, the procedure would nonetheless involve a lengthy delay. Plaintiff points to the average time for reexamination, 19.2 months, which does not account for the time for any appeal taken by the patentee pursuant to 35 U.S.C. § 305. At oral argument, counsel for the defendants conceded that the delay could be at least one year, even with the PTO's expedited attention if there were a stay. Thus, the delay involved would likely be at least one year and could easily exceed two years. In light of the substantial time and resources already invested into this litigation, such a length delay would prejudice the plaintiff, who claims that the defendants continue to wilfully infringe the '656 patent.

> \* \* \*

> "Parties should not be permitted to abuse the [reexamination] process by applying for reexamination after protracted, expensive discovery or trial preparation."

4

*Freeman v. Minnesota Mining and Manufacturing Co.*, 661 F. Supp. 886, 888 (D. Del. 1987) [Defendant was aware of prior art on which reexamination was based for eight months before filing petition for reexamination and case had been pending for more than two years], *quoting Digital Magnetic Sys. Inc. v. Ansley*, 213 U.S.P.Q. 290 (W.D. Okla. 1982). "To allow [3Com] to now use the reexamination process to get this case stayed would be to allow a defendant to use the reexamination as a mere dilatory tactic." *Freeman*, 661 F. Supp. at 888.

In *Freeman v. Minnesota Mining and Manufacturing Co.*, 661 F. Supp. 886 (D. Del. 1987),

the court refused a stay in light of the fact that the suit was over two years old, discovery had been

concluded, and defendant knew of the relied-upon prior art many months prior to seeking the stay.

The advanced stage of the litigation coupled with defendants' unjustified delay also precluded

a stay in *Remington Arms Co., Inc. v. Modern Muzzleloading, Inc.*, 1998 WL 1037920 (M.D.N.C.

1998) (copy attached).

Generally, courts grant stays where the case is in the early stages of litigation.

\*   \*   \*

The most compelling reason for denying the stay, however, is Defendant's unjustified delay in requesting a second reexamination with the PTO. Although Defendant maintains that the newly found prior art, which forms the basis for its second reexamination petition, was just recently discovered, this court finds evidence to the contrary. The record indicates that Defendant was aware of the prior art as early as May 5, 1998, if not sooner, when Defendant deposed the inventor of the patent.

\*   \*   \*

Generally, courts are reluctant to stay proceedings where a party is using the reexamination process merely as a dilatory tactic. . . . Therefore, Defendant's unjustified delay in filing its reexamination petition weighs in favor of denying the stay.

*Remington*, 1998 WL 1037920 at \*2-\*3.

The short and simple answer to defendants' request for stay is that they have known about the

relied-upon prior art for years and could have sought a reexamination years ago. They should not

5

be rewarded for their dilatory tactics in waiting until fact discovery has been completed, initial expert reports have been exchanged, and the parties have been through an appeal before opting to pursue reexamination and a stay to again postpone trial on the merits.

While defendants argue that the Federal Circuit decision has a bearing upon the reexamination, there is a total failure to explain *how* this decision in any way affects defendants' arguments about patent validity.  In fact, the Federal Circuit decision dealt with only two claim construction issues: the meaning of the "air circulating means" and "product coating zones" claim limitations. Defendants have not explained why either of these limitations as construed are pivotal in a validity determination.  That is to say, defendants offer no explanation as to why the claims as interpreted by defendants would not have been invalid but are rendered invalid by the Federal Circuit's construction of the air circulating means and product coating zones limitations.  The reason why defendants are silent on this point is clear: the Federal Circuit's decision is irrelevant to defendants' invalidity arguments, which would have been the same before the decision as they are now.

### C.   An Unconditional Stay Would Prejudice Plaintiff

One of the key factors in assessing the propriety of a stay pending reexamination is the extent of prejudice to the patentee.  Here, the prejudice is substantial.

In the first place, a stay would further reduce the period of exclusivity granted under the '683 patent.  Thus, Wenger would be deprived for a period longer than necessary of the right to exclude others from making, using or selling the patented invention.  Simply put, if defendants are permitted to continue their infringing activities, Wenger does not get in recompense an additional period of exclusivity added on to the originally granted patent term.  The undue delay now sought by defendants therefore necessarily prejudices Wenger.

6

Wenger's patent issued on March 31, 1992, based on an application filed February 21, 1991, and will expire February 21, 2011. Defendants have been infringing for over three years of this term. Even under the average pendency statistics shown in the attachment to defendants' memorandum, the PTO would not complete reexamination in much less than two years. An appeal from any adverse determination, which would go first to the PTO Board of Appeals and then to the Federal Circuit, would easily add 2-3 extra years to the requested stay. Defendants' scenario then would involve a trial (and possibly a further appeal) after reexamination is concluded. Meanwhile, Wenger's patent term is wasting and defendants continue to infringe. The value of injunctive relief would obviously progressively decline during the stay.

It is a common misconception that monetary damages always can compensate a patent owner for an infringement of the owner's right to exclude others.

> The opportunity to practice an invention during the notoriously length course of patent litigation may itself tempt infringers. . . . The nature of the patent grant thus weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude.

*H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987) (affirming finding of irreparable harm and grant of preliminary injunction); overruled on other grounds *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (fact issues in claim construction).

Equally prejudicial is the fact that plaintiff has no guarantee that defendants will be able to pay the steadily mounting damages at the end of a lengthy stay and after trial. That is, the damages due Wenger *prior to* the appeal totaled approximately $582,000 plus prejudgment interest (Report of Wenger's damage expert Redler, p. 7). At present, Wenger has no information about the number

7

of infringing machines sold by defendants during the course of the appeal, but if these sales were commensurate with pre-appeal sales, then several hundred thousand dollars have been added to the damage total. Now defendants effectively demand a license from the Court to go on infringing for a period of at least about two additional years, thereby multiplying damages yet again.

CMS and Vector are relatively small companies. See attached Dunn and Bradstreet Reports, Exhibits B and C. Although Wenger is not aware of the complete financial condition of the defendants, Wenger has no assurance that defendants will be able to pay the accrued damages when the day of reckoning finally comes. There is nothing to prevent defendants from simply declaring bankruptcy after an ultimate adverse judgment, having made their profits during the stay and leaving Wenger without effective recourse to recover the substantial damages it has suffered.

An unconditional stay would also severely prejudice plaintiff because access to important evidence of patentability will be denied it in the reexamination that would be available to this Court in reaching an obviousness conclusion. One of the "secondary considerations" bearing upon the issue of obviousness of a claimed invention is that of commercial success, i.e., if a patentee can show an appropriate level of commercial success, this can have the effect of rebutting a *prima facie* case of obviousness invalidity. "It is the secondary considerations that are often most probative and determinative of the ultimate conclusion of obviousness or nonobviousness." *Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996); and *Winner International Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed. Cir. 2000).

It is also well established that the *defendants'* sales figures can be used as a part of the overall commercial success picture, particularly where as here infringement is established. *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 920, 1130 (Fed. Cir. 2000) ("Our case law

8

provides that the success of an infringing product is considered to be evidence of the commercial success of the claimed invention."); *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579-80 (Fed. Cir. 1997).

At trial of this case, therefore, plaintiff will be able to use defendants' sales of the infringing machines as evidence of nonobviousness. Furthermore, absent the stay, Wenger would proceed to update its damage discovery and have the corollary benefit of enhanced commercial success evidence based upon defendants' sales during the appeal.

Normally, evidence of secondary considerations such as commercial success can be submitted to the PTO during the examination process in order to overcome an obviousness rejection. Commercial success evidence is also normally submissible in reexaminations. 37 C.F.R. § 1.132. However, owing to the Protective Order in this case as it presently stands, Wenger would be unable to present this very significant and persuasive evidence to the Patent Office. Furthermore, a stay would prevent Wenger from updating defendants' sales. It is submitted that defendants should not by virtue of selecting the PTO as a battleground be able to deprive Wenger of the ability to present very significant evidence which would be fully available to it in the present forum.

Finally, and perhaps most importantly, defendants' stay proposal makes no attempt to counter-balance the prejudice Wenger will suffer from the delay attendant on reexamination by stipulating that they will be bound by the results of reexamination. Defendants want to delay the progress of this case for two years or more via the requested stay, but they have not indicated that the patent validity question will even then be settled. The fact that a PTO reexamination may not be conclusive is another basis for denying a stay. In *Rohm and Haas Co. v. Brotech Corp.*, 24 USPQ2d 1369,

9

1372, 1992 WL 313099 (D. Del. 1992)[2], a stay granted in late 1991 was lifted by the district court in May of the following year. A significant factor leading to lifting of the stay was that "the reexamination probably will not resolve the disputes between the parties." To a similar effect is *Gladish v. Tyco Toys Inc.*, 29 USPQ2d 1718, 1719, 1993 WL 625509 (E.D. Cal. 1993), where a stay was denied because the reexamination "will not finally resolve all the issues in the litigation."

**D.    The Cases Cited by Defendants Do Not Support a Stay Under the Circumstances of This Case**

The decision to grant or reject defendants' stay request is within the sound discretion of this Court. However, the factors enumerated above militate against granting of an unconditional stay. The present case differs markedly from the situations presented in the cases defendants cited in its memorandum.

The principal case relied upon by defendants, *Emhart Industries Inc. v. Sankyo Seiki Mfg. Co., Ltd.*, 3 USPQ2d 1889 (N.D. Ill. 1987), is readily distinguishable. In the first place, the relied upon prior art was not established until after depositions were taken, and the defendants thereupon promptly sought reexamination and a stay. Here, all of the references now being advanced by defendants in the reexamination qualify as prior art[3] because of their dates of issue, and have been known or readily available to defendants for years. Second, in *Emhart*, the defendant "assured" the court that it would be bound by the decision of the PTO. 3 USPQ2d at 1892. As pointed out above, no such assurances have been forthcoming from the present defendants.

---

[2]   Copies of USPQ cases relied upon by plaintiff in this memorandum are attached.

[3]   That is, under 35 U.S.C. § 102(b), all of the references are prior art because they issued more than one year prior to the filing date of the '683 patent. However, these references are not *invalidating* prior art, notwithstanding defendants' assertions.

10

The other stay cases cited by defendants are equally inapposite. In *Robert H. Harris Co. Inc. v. Metal Manufacturing Co. Inc.*, 19 USPQ2d 1786, 1789 (E.D. Ark. 1991), the stay was granted because the case had been pending for less than a year and no expensive discovery or pretrial preparation had been made. Similarly, in *Grayling Industries v. GPAC Inc.*, 19 USPQ2d 1872, 1874 (N.D. Ga. 1991), the stay was granted because the requestor's prior art was uncovered only during discovery. In *Brown v. Schimano American Corp.*, 18 USPQ2d 1496 (C.D. Cal. 1991), the stay was approved in light of a finding that the defendants had not abused the reexamination process in an attempt to delay trial proceedings. No such finding is supportable in the present case. *Ingro v. Tyco Industries, Inc.*, 227 USPQ 69 (N.D. Ill. 1985), involved a situation where the stay was predicated upon the fact that the proceedings were at a very early stage. In *Fisher Controls Co., Inc. v. Control Components, Inc.*, 443 F. Supp. 581, 583 (S.D. Iowa 1977), the fact that discovery had not been completed was the principal basis for granting the stay. In this case, fact discovery has long been concluded. The stay in *ASCII Corp. v. STD Entertainment USA, Inc.*, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994) was based upon the fact that "the parties are in the initial stages of the lawsuit and have undertaken little or no discovery." Finally, in *Bausch & Lomb Inc. v. Alcon Laboratories, Inc.*, 914 F. Supp. 951, 953 (W.D.N.Y. 1996), the court noted that "[s]ince the time this action was commenced there has been a flurry of activity at the PTO, all or some of which appears to implicate the validity of the '607 patent . . . I find that a short stay of the proceedings before me will not greatly prejudice any party. . ." In this case, the reexamination has been filed after three years of pendency and the stay will in no event be "short."

In sum, none of the cases defendants cited in its memorandum in support of a stay approved a stay under conditions anything like those extant in the present litigation.

11

### III. IF THE COURT CONCLUDES THAT A STAY IS APPROPRIATE, THE STAY SHOULD BE CONDITIONED SO AS TO MINIMIZE PREJUDICE TO PLAINTIFF

As pointed out above, plaintiff would be significantly prejudiced by a grant of the requested stay. However, if the Court is of the view that a stay nevertheless may be appropriate, Wenger submitts that the stay should only be granted under the following conditions.

1. The Court should order defendants to update their discovery answers insofar as sales of infringing machinery is concerned, to apprise plaintiff of the extent of infringing sales occurring during the appeal or otherwise previously nonreported. Furthermore, the Court should modify the Protective Order as to all of defendants' infringing sales, so as to permit Wenger to include these sales figures in its commercial success showings to the PTO. This will at least place Wenger in a similar position in the PTO as it would be before this Court.

2. The Court should order that all sales made by defendants during the reexamination be subject to a 10% escrow deposit. That is, 10% of the sales prices of each coater/dryer device sold by defendants should be placed in independent escrow, to be dispersed only upon order of this Court. In this way, Wenger will be at least partially protected and recompensed for any sales during the period the litigation would be prolonged in the event a stay is granted.

3. The stay should be contingent upon defendants' assurance that the results of the PTO reexamination will be conclusive, i.e., that if one or more of the infringed claims survive reexamination, the only issues left in this case will be damage-related (e.g., the quantum of damages and any multiplication thereof because of wilful infringement). If, as

defendants assert, the prior art relied upon in the reexamination is invalidating, then such an agreement by defendants presents no prejudice to them.

It is believed that a stay conditioned in the foregoing manner would greatly ameliorate the prejudice to Wenger. At the same time, such conditions have no adverse impact upon defendants.

## IV.  CONCLUSION

Wenger believes that an unconditional stay of the type sought by defendants is both unsupported by law and equitably inappropriate at the late stage of this suit. If the Court feels that a stay pending reexamination should be granted, then the conditions set forth herein should be imposed.

Respectfully submitted,

John M. Collins
Warren N. Williams
HOVEY, WILLIAMS, TIMMONS & COLLINS
2405 Grand Blvd., Suite 400
Kansas City, Missouri 64108
816/474-9050
816/474-9057 (FAX)

ATTORNEYS FOR PLAINTIFF

OF COUNSEL:

G. Brian Pingel
PINGEL & TEMPLER, P.C.
3737 Woodland Avenue, Suite 437
West Des Moines, Iowa 50309
515/225-3737
515/225-9510 (FAX)

13

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Brief in Opposition to Defendants' Motion to Stay

Proceeding Pending Reexamination was served upon Mr. Kirk Hartung, Zarley, McKee, Thomte,

Voorhees & Sease, by first class mail, postage prepaid, this 5th day of June, 2001.

John M. Collins

FILED
DES MOINES, IOWA

93 APR 16 PM 4:23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IOWA, SOUTHERN DIVISION
CENTRAL DISTRICT

WENGER MANUFACTURING, INC. )
a Kansas Corporation, )
                              )
         Plaintiff, )
                              )
                              )
vs. )                              Civil Action No. 4-98-CV90083
                              )
                              )
COATING MACHINERY SYSTEMS, )
INC., an Iowa corporation, and )
VECTOR CORPORATION, )
                              )
         Defendants. )

## EXPERT WITNESS REPORT OF G. ROLAND HILBORN

I, G. Roland Hilborn, being duly sworn, hereby declare and state as follows:

1.     I have been retained by Coating Machinery Systems, Inc. ("CMS") and Vector

Corporation ("Vector"), to give my opinions and testify at trial regarding certain issues relating

to U.S. Patent No. 5,100,683 ("the '683 patent") in the above-captioned litigation against Wenger

Manufacturing, Inc. ("Wenger"), including the structure and operation of the coating machines

described in the '683 patent and as manufactured and sold by CMS, as well as invalidity of the

'683 patent.  I understand that the Court has interpreted the '683 claims, which interpretation I

have relied upon for purpose of this report.  Should any interpretations or rulings of the Court

change, I reserve the right to modify this report, including providing an infringement analysis,

which I have not done in view of the Court's previous ruling on infringement.



EXHIBIT
A

## BACKGROUND

2.      I am being compensated at a rate of $150 per hour for my work in this case.

3.      I have a Bachelor of Science Degree, Drexel University in 1975.

4.      I am a senior area technical manager for ColorCon, Inc. in West Point,
Pennsylvania. I have approximately 20 years at ColorCon working in the film and coating art
and with film and coating machinery, including continuous coating machines such as side vented
coating pan machines, which generally is the type of CMS machines involved in this litigation.
As part of my job responsibilities, I have developed and teach a class on product coating and
drying. This class is attended by technicians in the product coating industry.

5.      I have approximately 10 years prior to that with F. G. Okie Company of Fort
Washington, Pennsylvania (which was acquired by ColorCon), working in the same area, namely
film and coating methods and film and coating machines.

6.      I have approximately 2 years prior to F. G. Okie with a division of Crane
Company working in the industrial water treatment chemical lab.

7.      I have approximately 6 years prior to Crane Company with Superior Lube, a small
diameter precision metallic tubing company of Collegeville, Pennsylvania, working as a lab
technician.

8.      I am the named inventor on U. S. Patents 5,435,840 and 5,006,362, which relate
to printing of marks, such as logos with ingestible inks onto pharmaceutical tablets and capsules,
confectionery, and food products.

## OPINIONS

9.     In forming my opinions, I have reviewed various documents exchanged by the parties in discovery, including the '683 patent and its file history, the parties' briefs on cross-motions for summary judgment, other documents showing the structure and operation of the accused infringing CMS coating machines, the Court Order regarding claim interpretation, the expert report of Mr. Ronning, and various prior art patents, including:

| Inventor Name | U. S. Patent Number |
|---|---|
| Schady | 3,934,545 |
| Benson | 3,167,035 |
| Baumgard | 1,391,604 |
| Motoyama | 4,027,624 |
| Okawara | 4,064,831 |
| Glatt, et al. | 4,543,906 |
| Casey | 4,639,383 |
| Motoyama, et al. | 4,640,218 |
| Hostetler | 3,573,966 |
| Kellogg | 2,196,395 |
| Lanhoff | 22,177 |

10.     The person of ordinary skill in this art includes experienced technicians and machine/process designers who have gained skill in the product coating industry through on-the-job training, and degreed engineers with some experience in the product coating industry.

11.     Based upon my review of the '683 Wenger patent, its file history, and the interpretation of the claims as made by the Court, I understand the structure, operation and function of the coating and drying machine disclosed in the Wenger '683 patent, as well as the elements of claims 1 and 2.

12.     The Wenger '683 patent relates to what is known in the industry as a "sugar coating" machine and process. In sugar coating, the material being coated, such as food, is

sprayed with a wet solution from one or more nozzles and then moved downstream to be dried

by a flow of air passing through the wet-coated material. Thus, as seen in the Wenger '683

patent, the product is coated in a first spray zone 68, and then moved to a drying zone 78 where

air passes through perforations in the sidewall of the drum to dry the coating solution onto the

food product. The food product is then moved downstream to a second spray station 70 for

application of additional liquid coating material, and then moved downstream to a second drying

zone 80. The coating and drying processes are repeated in a third spray zone 72 and a third

drying zone 82. Thus, the coating and drying steps are performed sequentially to build up a layer

of coating on the food product.

13.     A second type of coating and drying process used in the industry is known as

"film coating." In film coating, the product is coated with a liquid solution from a spray nozzle

or nozzles that substantially instantaneously dries on the product. Film coating is a substantially

different process from sugar coating. The type of process used is a function of the nature and

characteristics of the product being coated and the nature and characteristics of the coating

solution. The CMS machine utilizes the film coating process, rather than the sugar coating

process as in the Wenger '683 patent.

14.     In reviewing the above listed prior art, the most relevant patent is the Schady

3,934,545 patent. The Schady patent is not referenced as being cited by the Patent Office

Examiner on the face of the Wenger '683 patent, nor is the Schady patent referenced anywhere in

the file history of the '683 patent.                    -

15.     The chart on page 6 compares the Schady patent and process with the elements of

claims 1 and 2 of the Wenger '683 patent. As seen from this chart, the Schady patent discloses

each and every element of claims 1 and 2, except for element E, "means for selectively inclining said reel with said inlet elevated relative to said outlet." This element E provides for tilting of the reel or drum. Such tilting is disclosed in the Benson 3,167,035 patent. More particularly, Benson relies upon a threaded screw or jack 64 with a handle 70 which allows the outlet end 28 of the Benson drum to be elevated relevant to the inlet end 20 with pivotal movement about the pivot pins 62, as described at column 2, line 70 - column 3, line 9.

16.     To a person having ordinary skill in the art of product coating at the time of the Wenger invention (the late 1980's), it would have been obvious to utilize a screw jack such as that disclosed in the Benson patent on the drum disclosed in the Singer patent so as to permit the Singer drum to be tilted. The motivation for combining the tilting function of Benson with the coating machine of Schady would be to control the flow rate of material through the Schady drum during the coating and drying process. For example, if it is desirable to increase the flow rate of product from the inlet end to the outlet end in the Schady drum, one skilled in the art would employ a well-known screw jack, such as that shown in Benson, to raise the inlet end of the Schady drum relative to the outlet end, such that the force of gravity will cause the material to move more quickly from the inlet end to the outlet end, as was well known in the art.

_____          _____
Date                                     G. Roland Hilborn

| Wenger Patent-in-Suit<br>Singer 5,100,683<br><br>Claim 1 | Schady 3,934,545 |
|---|---|
| An apparatus for coating and drying a food product comprising: | Schady discloses a machine and process for coating and drying a food product. See the abstract, lines 5-6; |
| A) a dryer housing; | Housing 55 (col. 4, lines 31-32), col. 6, line 50; Figures 1,2; |
| B) an elongated reel presenting a longitudinal axis and having an inlet, an outlet, and a sidewall defining an interior and presenting a plurality of perforations, said side wall being located substantially within said housing whereby said perforations are surrounded by said housing; | Drum 10; inlet openings 22, 24 in end plates 18, 20 (col. 2, lines 56-59); outlet discharge hatch 80 (col. 6, lines 33-41); perforations 37 (col. 2, lines 3-9); col. 6, line 51. |
| C) means for introducing the product into the interior of said reel through said inlet; | Product is introduced into the Schady drum for coating. See Col. 3, lines 13-16; col. 6, lines 51-53. |
| D) means for rotating said reel within said housing; | Driving wheels 12 and motor 16 (col. 2, lines 49-54); col. 3, lines 16-17; col. 6, line 54. |
| E) means for selectively inclining said reel with said inlet elevated relative to said outlet; | |
| F) air circulating means associated with said dryer housing for circulating air through said reel, the air circulating means including means for drawing air from the interior of the reel into said housing in order to provide positive air flow through the apparatus; and | The air circulation structure includes air supply duct 50, inlet manifold 51, and air inlet 52 (col. 3, lines 50-54). Air recirculation is described throughout the Schady patent. See Abstract, lines 7-12; col. 1, lines 65-68; col. 2, lines 21-27; col. 4, lines 5-8, 29-38; recirculating air conduit 58 (col. 4, lines 39-44); col. 7, lines 9-18. |
| G) means defining a plurality of separate product coating zones longitudinally spaced along said reel, each of said zones including at least one spray nozzle directed toward said sidewall for pressurized spraying of a coating on the food product during passage of said food product from said inlet to said outlet. | Plurality of spray nozzles along liquid coating material conduit 28 (col. 2, lines 59-67); col. 6, lines 58-59; Figure 3 |

| Claim 2 | |
|---|---|
| An apparatus for coating and drying a food product as set forth in claim 1 including structure associated with said housing defining a plenum therein for receiving said air passing through said perforations from the interior of said reel. | Discharge manifold 54 (col. 4, lines 29-32). Figures 2 and 3. |

each and every element of claims 1 and 2, except for element E, "means for selectively inclining said reel with said inlet elevated relative to said outlet." This element E provides for tilting of the reel or drum. Such tilting is disclosed in the Benson 3,167,035 patent. More particularly, Benson relies upon a threaded screw or jack 64 with a handle 70 which allows the outlet end 28 of the Benson drum to be elevated relevant to the inlet end 20 with pivotal movement about the pivot pins 62, as described at column 2, line 70 - column 3, line 9.

16.     To a person having ordinary skill in the art of product coating at the time of the Wenger invention (the late 1980's), it would have been obvious to utilize a screw jack such as that disclosed in the Benson patent on the drum disclosed in the Singer patent so as to permit the Singer drum to be tilted. The motivation for combining the tilting function of Benson with the coating machine of Schady would be to control the flow rate of material through the Schady drum during the coating and drying process. For example, if it is desirable to increase the flow rate of product from the inlet end to the outlet end in the Schady drum, one skilled in the art would employ a well-known screw jack, such as that shown in Benson, to raise the inlet end of the Schady drum relative to the outlet end, such that the force of gravity will cause the material to move more quickly from the inlet end to the outlet end, as was well known in the art.

_April 16, 1999_          _J. Roland Hilborn_
Date                                    G. Roland Hilborn

5

Respectfully submitted,

COATING MACHINERY SYSTEMS, INC.

By _Kirk M. Hartung_

Kirk M. Hartung
Jeffrey D. Harty
ZARLEY, McKEE, THOMTE, VOORHEES
& SEASE
801 Grand Avenue - Suite 3200
Des Moines, Iowa  50309-2721
515-288-3667  phone
515-288-1338  fax

ATTORNEYS FOR DEFENDANT

- - - - -

## CERTIFICATE OF SERVICE

I hereby declare that a copy of the foregoing pleading was sent by first-class U.S. Mail on to the following on this 16th day of April, 1999 to:

G. Brian Pingel
SHEARER, TEMPLER & PINGEL
3737 Woodland Avenue
Suite 437
West Des Moines, Iowa 50309

John M. Collins
Warren N. Williams
HOVEY, WILLIAMS, TIMMONS & COLLINS
2405 Grand Blvd., Suite 400
Kansas City, Missouri 64108

_Kirk M. Hartung_



**Dun & Bradstreet**                                    *U.S. Business/Credit Reports*

```
78-536-0108

010430
VECTOR CORPERATION
        COPYRIGHT 2001 DUN & BRADSTREET INC.
        ALL RIGHTS RESERVED


                        COMPREHENSIVE REPORT

DUNS: 78-536-0108
VECTOR CORPERATION
  (SUBSIDIARY OF VECTOR           FINANCIAL STRESS CLASS: 1
  CORPORATION, MARION, IA)        CREDIT SCORE CLASS:     3
  (FORMERLY: COATING
  MACHINERY SYSTEMS INC)                     KEY
                                  ==============================
302 CAMPUS DR                     LOWEST RISK     HIGHEST RISK
HUXLEY IA 50124                      1    2    3    4    5
TEL: 515 597-3390

SIC:      35 69
LINE OF BUSINESS: ASSEMBLES AND WHOLESALES FILM COATING EQUIPMENT
CONTROL DATE:     1995                     DATE PRINTED: JUN 04 2001

CHIEF EXECUTIVE: STEVE JENSEN, PRES

=============================================================================
EXECUTIVE SUMMARY

- The Financial Stress Class of 1 for this company shows that during the
  previous year, firms with this classification had a failure rate of
  .37% (37 per 10,000), which is lower than the national average.
- The Credit Score Class of 3 for this company shows that during the previous
  year, 10.4% of the firms with this classification paid one or more bills
  severely delinquent, which is lower than the national average.
- Subject company pays its bills an average 11 days beyond terms.
- Subject company's industry pays its bills an average 11 days beyond terms.
- Subject company's payment performance is the same as the average for its
  industry.
- Special events are reported for this business.
- Financing is secured.
- Under present management control 6 years.
- No record of open Suit(s), Lien(s), or Judgment(s) in the D&B database.
- History is clear.


=============================================================================
CREDIT CAPACITY SUMMARY

D&B Rating:      1R3           Payment Activity
                                (based on 20 experiences):
                                Average High Credit:    $1,555
# of Employees                  Highest Credit:        $15,000
Total:           15             Total Highest Credits: $28,500
```

**EXHIBIT**

**B**

PENGAD-Bayonne, N.J.

```
Worth:              -
Working Capital:    -
```

```
================================================================================
```
SPECIAL EVENTS

```
04/30/01      Business name changed from Coating Machinery Systems Inc to
              Vector Corperation.
```

```
================================================================================
```
FINANCIAL STRESS SUMMARY

The Financial Stress Model predicts the likelihood of a firm ceasing business
without paying all creditors in full, or reorganizing or obtaining relief from
creditors under state/federal law over the next 12 months. Scores were
calculated using a statistically valid model derived from D&B's extensive data
files.


```
Financial Stress Class:                           1
(Highest Risk: 5; Lowest Risk: 1)

Incidence of Financial Stress Among
Companies with this Classification:       0.37% (37 per 10,000)

Incidence of Financial Stress:            0.80% (80 per 10,000)
- National Average

Financial Stress National Percentile:            88
(Highest Risk: 1; Lowest Risk: 100)

Financial Stress Score:                         1522
(Highest Risk: 1,001; Lowest Risk: 1,850)
```

The Financial Stress Class for this company is based on the following factors:

```
   - 20% of trade experiences indicate slow payment(s) are present.
   - Payment experiences exist for this firm which are greater than 60 days
     past due.
   - No open record of suit(s) in the D&B files.
   - No record of open lien(s), or judgements(s) in the D&B files.
```

```
 Notes:
```

- The Financial Stress Class indicates that this firm shares some of
the same business and financial characteristics of other companies with
this classification.  It does not mean the firm will necessarily
experience financial stress.

- The Incidence of Financial Stress shows the percentage of firms in a
given Class that discontinued operations over the past year with loss
to creditors.  The Incidence of Financial Stress - National Average
represents the national failure rate and is provided for comparative
purposes.

- The Financial Stress National Percentile reflects the relative
ranking of a company among all scorable companies in D&B's file.

- The Financial Stress Score offers a more precise measure of the level

of risk than the Class and Percentile.  It is especially helpful to
customers using a scorecard approach to determining overall business
performance.

- All Financial Stress Class, Percentile, Score and Incidence
statistics are based on 1997.

==============================================================================
FINANCIAL STRESS NORMS

|                                                      | National Percentile |
|------------------------------------------------------|:-------------------:|
| Norms for Companies in the Same ...                  |                     |
| - Region   (WEST NORTH CENTRAL)                      | 63                  |
| - Industry: MANUFACTURING                            | 58                  |
| - Employee Range (10-19)                             | 68                  |
| - Years in Business Range (6-10)                     | 60                  |
| - Subject Company                                    | 88                  |

Key Comparisons
The subject company has a Financial Stress Percentile that shows:

  - Lower risk than other companies in the same region.
  - Lower risk than other companies in the same industry.
  - Lower risk than other companies in the same employee size range.
  - Lower risk than other companies with a comparable number of years in
    business.

==============================================================================
CREDIT SCORE SUMMARY

The Credit Score Class predicts the likelihood of a firm paying in a severely
delinquent manner (90+ Days Past Terms) over the next twelve months.  It was
calculated using statistically valid models and the most recent payment
information in D&B's files.

Credit Score Class:                        3

Incidence of Delinquent Payment Among
Companies with this Classification:        10.40%

Percentile:                                59

The Credit Score Class for this company is based on the following factors:

  - 20% of trade experiences indicate slow payment(s) are present.
  - Payment experiences exist for this firm which are greater than 60 days past
    due.
  - No record of open suit(s), lien(s) or judgment(s) in the D&B files.

Notes:

  - The Incidence of Delinquent Payment is the percentage of companies with
    this classification that were reported 90 days past due or more by
    creditors. The calculation of this value is based on an inquiry weighted
    sample.

- The Percentile ranks this firm relative to other businesses. For example,
  a firm in the 80th percentile has a lower risk of paying in a severely
  delinquent manner than 79% of all scorable companies in D&B's files.

```
==============================================================================
```
CREDIT SCORE NORMS

|                                           | National Percentile |
|-------------------------------------------|---------------------|
| Norms for Companies in the Same ...       |                     |
| - Region   (WEST NORTH CENTRAL)           | 56                  |
| - Industry: MANUFACTURING                 | 51                  |
| - Employee Range (10-19)                  | 56                  |
| - Years in Business Range (6-10)          | 47                  |
| - Subject Company                         | 59                  |

Key Comparisons
The subject company has a Credit Score Percentile that shows:

- Lower risk than other companies in the same region.
- Lower risk than other companies in the same industry.
- Lower risk than other companies in the same employee size range.
- Lower risk than other companies with a comparable number of years in
  business.

```
==============================================================================
```
PAYMENT TRENDS

PAYDEX scores below are based on dollar weighted trade in most recent 12 mos.

| | '99 SEP | '99 DEC | '00 MAR | '00 JUN | '00 JUL | '00 AUG | '00 SEP | '00 OCT | '00 NOV | '00 DEC | '01 JAN | '01 FEB | '01 MAR | '01 APR | '01 MAY | '01 JUN |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| FIRM | 78 | 77 | 76 | 77 | 76 | 77 | 75 | 75 | 75 | 76 | 75 | 73 | 75 | 75 | 73 | 73 |

Industry
Quartiles
----------

| | | | | | | | | | | | | | | | | |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Upper  | 79 | 79 | 79 | 78 | | | 78 | | | 79 | | | 78 | | | |
| Median | 73 | 73 | 73 | 73 | | | 72 | | | 72 | | | 73 | | | |
| Lower  | 64 | 64 | 65 | 64 | | | 63 | | | 63 | | | 64 | | | |

```
   Industry PAYDEX based on:    KEY TO PAYDEX SCORES:
   SIC:  356X                    79   2 Days Beyond Terms
   829 Firms                     73  11 Days Beyond Terms
                                 63  20 Days Beyond Terms
```

```
==============================================================================
```
SUMMARY OF PAYMENT HABITS

Dollar Range Comparisons:

| Suppliers That Extend Credit of... | Number of Experiences: | Total Amount | % of Dollars Within Terms |
|------------------------------------|------------------------|--------------|---------------------------|
|                                    | #                      | $            | %                         |

```
OVER $100,000                 0              0           0
$50,000 - 99,999              0              0           0
$15,000 - 49,999              1         15,000         100
$ 5,000 - 14,999              0              0           0
$ 1,000 - 4,999               5          9,500          74
     Under 1,000             12          3,500          89
```

=============================================================================
PAYMENT ANALYSIS BY INDUSTRY

There are 20 payment experiences in D&B's file for the most recent 12 months,
with 7 experiences reported during the last three month period.

| | Total Recd # | Dollar Amount $ | Highest Credit $ | Within Terms | Slow 1-30 | Slow 31-60 | Slow 61-90 | Slow 91+ |
|---|---|---|---|---|---|---|---|---|
| | | | | --- % of dollar amount --- | | | | |
| Total in D&B's File | 20 | 28,500 | 15,000 | | | | | |
| | | | | | | | | |
| Industry | | | | | | | | |
| | | | | | | | | |
| Trucking non-local | 3 | 1,350 | 1,000 | 91 | 9 | 0 | 0 | 0 |
| Telephone communictns | 3 | 150 | 50 | 100 | 0 | 0 | 0 | 0 |
| Whol industrial suppl | 2 | 2,750 | 2,500 | 9 | 91 | 0 | 0 | 0 |
| Short-trm busn credit | 1 | 15,000 | 15,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg soap/detergents | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Whol metal | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Misc business credit | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Arrange cargo transpt | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Nonclassified | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Whol electrical equip | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Whol service paper | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Photocopying service | 1 | 250 | 250 | 0 | 100 | 0 | 0 | 0 |
| Ret mail-order house | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Misc business service | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

```
OTHER PAYMENT CATEGORIES:
Cash Experiences              0              0
Paying Record Unknown         1            500
Unfavorable Comments          0              0
Placed for Collection
   with D&B                   0              0
   other                      0            N/A
```

Indications of slowness can be the result of disputes over merchandise, skipped
invoices, etc.

=============================================================================
PUBLIC FILINGS SUMMARY

The following data includes both open and closed filings found in
D&B's database on the subject company.

| Record Type | # | Most Recent Filing Date |
|---|---|---|
| Bankruptcy Proceedings | 0 | - |
| Judgments | 0 | - |
| Liens | 0 | - |
| Suits | 0 | - |

```
      UCC's                              0              -
```

================================================================================
BUSINESS BACKGROUND

                                  HISTORY
         ----------------------------------------------------------------
         CORPORATE AND BUSINESS REGISTRATIONS REPORTED BY THE SECRETARY
         OF STATE OR OTHER OFFICIAL SOURCE AS OF 05/18/2001:

         BUSINESS TYPE: Corporation -      DATE INCORPORATED: 03/13/1992
                        Profit            STATE OF INCORP:   Iowa

         AUTH SHARES-COMMON:  100,000
         COMMON STOCK ISSUED: 0
         ----------------------------------------------------------------
04/30/01
         STEVE JENSEN, PRESIDENT
         DIRECTOR(S):  THE OFFICER(S)


             Business started Feb 1992 by Donald Barber.  Present control
         succeeded Jan 1 1995.  100% of capital stock is owned by parent
         company.
             STEVE JENSEN born 1954.  Jan 1 1995-present active here.  Joined
         Vector Corporation 1982.  Was employed by Mc Gladrey & Pullen, Cedar
         Rapids, IA 1977-82.  Graduated from University of Northern Iowa 1977.
         Is a certified public accountant.


                                OPERATIONS

04/30/01     Subsidiary of VECTOR CORPORATION, MARION, IA started 1972 which
         operates as design and manufacturing of machinery (used in the
         pharmaceutical and food industries).  Parent company owns 100% of
         capital stock.  Parent company has no other subsidiary(ies).
         Intercompany relations: None reported.
             As noted, this company is a subsidiary of Vector Corporation,
         DUNS number 062761010, and reference is made to that report for
         background information on the parent company and its management.  No
         financial information is available for the parent company.
             Assembles and wholesales film coating equipment.
         Domestic terms are 1/2 deposit, balance due upon shipment with some
         retainages.  International sales are on letter of credit basis. Has 60
         account(s).  Sells to agricultural and pharmaceutical concerns.
         Territory : United States & Canada.
         Nonseasonal.
                 EMPLOYEES:  15 which includes officer(s) and 2 part-time.
                 FACILITIES:  Leases 20,000 sq. ft. in steel building.
                 LOCATION:  Industrial section on well traveled street.

                           OTHER CORPORATE DETAILS
         CORPORATE STATUS:  ACTIVE
         CORPORATE AGENT:   STEVEN L JENSEN, 675 44TH ST, MARION, IA
         STATE ID NO:       000156793


================================================================================
FINANCIAL SUMMARY

KEY BUSINESS RATIOS

NOTE:
D&B has been unable to obtain sufficient financial information from this
company to calculate business ratios.  Our check of additional outside sources
also found no information available on its financial performance.

To help you in this instance, ratios for other firms in the same industry are
provided below to support your analysis of this business.

(Industry Norms Based on 68 Establishments)

| | Profitability % | | Short-Term Solvency | | Efficiency (%) | Utilization (%) |
|---|---|---|---|---|---|---|
| | Return on Sales | Return on Net Worth | Curr Ratio | Quick Ratio | Assets/ Sales | Total Liabs/ Net Worth |
| Firm | UN | UN | UN | UN | UN | UN |
| Industry Median | 2.9 | 11.3 | 2.2 | 1.2 | 50.8 | 65.7 |
| Industry Quartile | UN | UN | UN | UN | UN | UN |

UN = Unavailable

04/30/01      Sources contacted verified information on Apr 09, 2001.


===============================================================================
                           CUSTOMER SERVICE
If you need any additional information, or have any questions regarding this
report, please call our Customer Service Center at (800) 234-3867 from
anywhere within the U.S.  From outside the U.S., please call your local D&B
office.

                    END OF COMPREHENSIVE REPORT
** End of CR **

© 2001 Dun & Bradstreet, Inc.
Refer comments or questions to customer service.



*U.S. Business/Credit Reports*

06-276-1010

010602
VECTOR CORPORATION
        COPYRIGHT 2001 DUN & BRADSTREET INC.
        ALL RIGHTS RESERVED


                        COMPREHENSIVE REPORT


DUNS: 06-276-1010
VECTOR CORPORATION
  (FOREIGN PARENT IS FREUND               FINANCIAL STRESS CLASS: 1
  INDUSTRIAL COMPANY LTD,                 CREDIT SCORE CLASS:      4
  TOKYO, JAPAN)
                                                    KEY
675 44TH ST                              ==============================
AND BRANCH(ES) OR DIVISION(S)            LOWEST RISK        HIGHEST RISK
MARION IA 52302                              1    2    3    4    5
TEL: 319 377-8263


SIC:       35 59
LINE OF BUSINESS: MFG MACHINERY USED FOR PROCESSING TABLET & POWDER
                  MATERIALS
YEAR STARTED:     1972
CONTROL DATE:     1997                    DATE PRINTED: JUN 04 2001

CHIEF EXECUTIVE: JERRY ZAHRADNIK, PRES


==================================================================================
EXECUTIVE SUMMARY

- The Financial Stress Class of 1 for this company shows that during the
  previous year, firms with this classification had a failure rate of
  .37% (37 per 10,000), which is lower than the national average.
- The Credit Score Class of 4 for this company shows that during the previous
  year, 26.2% of the firms with this classification paid one or more bills
  severely delinquent, which is 1.58 times higher than the national average.
- Subject company pays its bills an average 15 days beyond terms.
- Subject company's industry pays its bills an average 15 days beyond terms.
- Subject company's payment performance is the same as the average for its
  industry.
- UCC filing(s) are reported for this business.
- Financing is secured.
- Under present management control 4 years.
- No record of open Suit(s), Lien(s), or Judgment(s) in the D&B database.
- History is clear.


==================================================================================
CREDIT CAPACITY SUMMARY

D&B Rating:       1R3                     Payment Activity
                                         (based on 96 experiences):
                                         Average High Credit:    $2,867

EXHIBIT

C

PENGAD-Bayonne, N. J.

```
# of Employees                    Highest Credit:         $50,000
Total:          120               Total Highest Credits:  $267,350
                (100 Here)

Worth:          -
Working Capital: -
```

==============================================================================
FINANCIAL STRESS SUMMARY

The Financial Stress Model predicts the likelihood of a firm ceasing business
without paying all creditors in full, or reorganizing or obtaining relief from
creditors under state/federal law over the next 12 months. Scores were
calculated using a statistically valid model derived from D&B's extensive data
files.

```
Financial Stress Class:                           1
(Highest Risk: 5; Lowest Risk: 1)

Incidence of Financial Stress Among
Companies with this Classification:       0.37% (37 per 10,000)

Incidence of Financial Stress:            0.80% (80 per 10,000)
- National Average

Financial Stress National Percentile:             65
(Highest Risk: 1; Lowest Risk: 100)

Financial Stress Score:                         1472
(Highest Risk: 1,001; Lowest Risk: 1,850)
```

The Financial Stress Class for this company is based on the following factors:

   - Payment information indicates negative payment comments.
   - Payment experiences exist for this firm which are greater than 60 days
     past due.
   - No open record of suit(s) in the D&B files.
   - No record of open lien(s), or judgements(s) in the D&B files.
   - 34% of trade experiences indicate slow payment(s) are present.

Notes:

- The Financial Stress Class indicates that this firm shares some of
the same business and financial characteristics of other companies with
this classification.  It does not mean the firm will necessarily
experience financial stress.

- The Incidence of Financial Stress shows the percentage of firms in a
given Class that discontinued operations over the past year with loss
to creditors.  The Incidence of Financial Stress - National Average
represents the national failure rate and is provided for comparative
purposes.

- The Financial Stress National Percentile reflects the relative
ranking of a company among all scorable companies in D&B's file.

- The Financial Stress Score offers a more precise measure of the level
of risk than the Class and Percentile.  It is especially helpful to
customers using a scorecard approach to determining overall business

performance.

- All Financial Stress Class, Percentile, Score and Incidence
statistics are based on 1997.

===============================================================================
FINANCIAL STRESS NORMS

| Norms for Companies in the Same ... | National Percentile |
|---|---|
| - Region   (WEST NORTH CENTRAL) | 63 |
| - Industry: MANUFACTURING | 58 |
| - Employee Range (100-499) | 78 |
| - Years in Business Range (3-5) | 40 |
| - Subject Company | 65 |

Key Comparisons
The subject company has a Financial Stress Percentile that shows:

   - Lower risk than other companies in the same region.
   - Lower risk than other companies in the same industry.
   - Higher risk than other companies in the same employee size range.
   - Lower risk than other companies with a comparable number of years in
     business.

===============================================================================
CREDIT SCORE SUMMARY

The Credit Score Class predicts the likelihood of a firm paying in a severely
delinquent manner (90+ Days Past Terms) over the next twelve months.  It was
calculated using statistically valid models and the most recent payment
information in D&B's files.

Credit Score Class:                      4

Incidence of Delinquent Payment Among
Companies with this Classification:      26.20%

Percentile:                              23

The Credit Score Class for this company is based on the following factors:

   - 34% of trade experiences indicate slow payment(s) are present.
   - Payment experiences exist for this firm which are greater than 60 days past
     due.
   - No record of open suit(s), lien(s) or judgment(s) in the D&B files.
   - Payment information indicates negative payment comments.

Notes:

   - The Incidence of Delinquent Payment is the percentage of companies with
     this classification that were reported 90 days past due or more by
     creditors. The calculation of this value is based on an inquiry weighted
     sample.

   - The Percentile ranks this firm relative to other businesses. For example,

a firm in the 80th percentile has a lower risk of paying in a severely
delinquent manner than 79% of all scorable companies in D&B's files.

========================================================================

CREDIT SCORE NORMS

|                                                      | National Percentile |
|------------------------------------------------------|---------------------|
| Norms for Companies in the Same ...                  |                     |
| - Region   (WEST NORTH CENTRAL)                      | 56                  |
| - Industry: MANUFACTURING                            | 51                  |
| - Employee Range (100-499)                           | 54                  |
| - Years in Business Range (3-5)                      | 37                  |
| - Subject Company                                    | 23                  |

Key Comparisons
The subject company has a Credit Score Percentile that shows:

- Higher risk than other companies in the same region.
- Higher risk than other companies in the same industry.
- Higher risk than other companies in the same employee size range.
- Higher risk than other companies with a comparable number of years in
  business.

========================================================================

PAYMENT TRENDS

PAYDEX scores below are based on dollar weighted trade in most recent 12 mos.

|                      | '99 SEP | '99 DEC | '00 MAR | '00 JUN | '00 JUL | '00 AUG | '00 SEP | '00 OCT | '00 NOV | '00 DEC | '01 JAN | '01 FEB | '01 MAR | '01 APR | '01 MAY | '01 JUN |
|----------------------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| FIRM                 | 65      | 66      | 68      | 72      | 71      | 70      | 69      | 70      | 72      | 69      | 70      | 70      | 70      | 70      | 70      | 70      |
| Industry Quartiles   |         |         |         |         |         |         |         |         |         |         |         |         |         |         |         |         |
| Upper                |         | 76      | 76      | 76      | 76      |         |         | 75      |         |         | 76      |         |         | 75      |         |         |
| Median               |         | 71      | 71      | 71      | 71      |         |         | 70      |         |         | 70      |         |         | 70      |         |         |
| Lower                |         | 64      | 64      | 64      | 64      |         |         | 63      |         |         | 64      |         |         | 64      |         |         |

| Industry PAYDEX based on: | KEY TO PAYDEX SCORES:       |
|---------------------------|-----------------------------|
| SIC:  355X                | 76   6 Days Beyond Terms    |
| 708 Firms                 | 71   14 Days Beyond Terms   |
|                           | 63   20 Days Beyond Terms   |

========================================================================

SUMMARY OF PAYMENT HABITS

Dollar Range Comparisons:

| Suppliers That Extend Credit of... | Number of Experiences: | Total Amount | % of Dollars Within Terms |
|------------------------------------|------------------------|--------------|---------------------------|
|                                    | #                      | $            | %                         |
| OVER $100,000                      | 0                      | 0            | 0                         |

| | | | |
|---|---|---|---|
| $50,000 - 99,999 | 1 | 50,000 | 100 |
| $15,000 - 49,999 | 4 | 65,000 | 62 |
| $ 5,000 - 14,999 | 13 | 80,000 | 72 |
| $ 1,000 - 4,999 | 23 | 39,500 | 55 |
| Under 1,000 | 46 | 14,950 | 82 |

===========================================================================

PAYMENT ANALYSIS BY INDUSTRY

There are 96 payment experiences in D&B's file for the most recent 12 months,
with 62 experiences reported during the last three month period.

| | Total Recd # | Dollar Amount $ | Highest Credit $ | Within Terms | Slow 1-30 | Slow 31-60 | Slow 61-90 | Slow 91+ |
|---|---|---|---|---|---|---|---|---|
| | | | | --- % of dollar amount --- | | | | |
| Total in D&B's File | 96 | 267,350 | 50,000 | | | | | |
| Industry | | | | | | | | |
| Trucking non-local | 14 | 14,400 | 7,500 | 74 | 16 | 1 | 0 | 9 |
| Nonclassified | 10 | 62,450 | 50,000 | 96 | 4 | 0 | 0 | 0 |
| Whol metal | 6 | 32,250 | 20,000 | 66 | 34 | 0 | 0 | 0 |
| Whol industrial suppl | 4 | 21,500 | 15,000 | 17 | 71 | 0 | 12 | 0 |
| Whol industrial equip | 3 | 5,750 | 5,000 | 52 | 48 | 0 | 0 | 0 |
| Mfg refrig/heat equip | 3 | 1,150 | 1,000 | 52 | 2 | 46 | 0 | 0 |
| Short-trm busn credit | 2 | 15,750 | 15,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg computers | 2 | 10,050 | 10,000 | 0 | 100 | 0 | 0 | 0 |
| Computer maintenance | 2 | 6,000 | 5,000 | 50 | 50 | 0 | 0 | 0 |
| Telephone communictns | 2 | 2,550 | 2,500 | 2 | 0 | 49 | 0 | 49 |
| Help supply service | 2 | 2,600 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Whol durable goods | 2 | 1,750 | 1,000 | 0 | 100 | 0 | 0 | 0 |
| Whol service paper | 2 | 500 | 250 | 50 | 50 | 0 | 0 | 0 |
| Mfg electric test prd | 1 | 15,000 | 15,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg surgical supplies | 1 | 7,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg measure devices | 1 | 7,500 | 7,500 | 100 | 0 | 0 | 0 | 0 |
| General warehousing | 1 | 5,000 | 5,000 | 50 | 0 | 0 | 50 | 0 |
| Ret-direct selling | 1 | 5,000 | 5,000 | 100 | 0 | 0 | 0 | 0 |
| Whol misc profsn eqpt | 1 | 5,000 | 5,000 | 50 | 0 | 50 | 0 | 0 |
| Whol chemicals | 1 | 5,000 | 5,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg soap/detergents | 1 | 2,500 | 2,500 | 50 | 50 | 0 | 0 | 0 |
| Misc business credit | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg photograph equip | 1 | 2,500 | 2,500 | 100 | 0 | 0 | 0 | 0 |
| Mfg fluid power pumps | 1 | 2,500 | 2,500 | 50 | 50 | 0 | 0 | 0 |
| Mfg organic chemicals | 1 | 2,500 | 2,500 | 50 | 50 | 0 | 0 | 0 |
| Whol office supplies | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Mfg public bldg furn | 1 | 1,000 | 1,000 | 100 | 0 | 0 | 0 | 0 |
| Whol office equipment | 1 | 1,000 | 1,000 | 0 | 50 | 50 | 0 | 0 |
| Photocopying service | 1 | 1,000 | 1,000 | 50 | 50 | 0 | 0 | 0 |
| Mfg misc special mach | 1 | 1,000 | 1,000 | 0 | 50 | 0 | 50 | 0 |
| Misc general gov't | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Mfg non-elect heaters | 1 | 750 | 750 | 100 | 0 | 0 | 0 | 0 |
| Mfg pumping equipment | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Ret mail-order house | 1 | 500 | 500 | 50 | 0 | 50 | 0 | 0 |
| Ret paint/wallpaper | 1 | 500 | 500 | 100 | 0 | 0 | 0 | 0 |
| Mfg environment cntrl | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Mfg plastic sheet/flm | 1 | 250 | 250 | 0 | 100 | 0 | 0 | 0 |
| Mfg cutting tool/part | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Mfg drug preparations | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Misc publishing | 1 | 250 | 250 | 0 | 50 | 50 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mfg scales/balances | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Whol electrical equip | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Mfg speed changers | 1 | 250 | 250 | 100 | 0 | 0 | 0 | 0 |
| Mfg metalworking mach | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Air courier service | 1 | 100 | 100 | 100 | 0 | 0 | 0 | 0 |
| Lcl truck-w/o storage | 1 | 50 | 50 | 100 | 0 | 0 | 0 | 0 |
| Misc business service | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mfg industrial gases | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

```
OTHER PAYMENT CATEGORIES:
Cash Experiences          0           0
Paying Record Unknown     6      16,900
Unfavorable Comments      1       1,000
Placed for Collection
  with D&B                0           0
  other                   0         N/A
```

Indications of slowness can be the result of disputes over merchandise, skipped invoices, etc.

================================================================================
PUBLIC FILINGS SUMMARY

The following data includes both open and closed filings found in D&B's database on the subject company.

| Record Type | # | Most Recent Filing Date |
|---|---|---|
| Bankruptcy Proceedings | 0 | - |
| Judgments | 0 | - |
| Liens | 0 | - |
| Suits | 0 | - |
| UCC's | 5 | 04/26/2001 |

================================================================================
PUBLIC FILINGS DETAIL

The following data is for information purposes only and is not the official record.  Certified copies can only be obtained from the official source.

--------------------------------------------------------------------------------
                          * * * UCC FILING(S) * * *
--------------------------------------------------------------------------------
```
COLLATERAL: Equipment
FILING NO:  K988638              DATE FILED:          02/03/1999
TYPE:       Original            LATEST INFO RECEIVED: 02/11/1999
SEC. PARTY: HALES MACHINE TOOL, INC.,    FILED WITH: SECRETARY OF
            PLYMOUTH, MN                             STATE/UCC DIVISION,
DEBTOR:     VECTOR CORPORATION                       IA
--------------------------------------------------------------------------------
COLLATERAL: Equipment
FILING NO:  K945732              DATE FILED:          09/02/1998
TYPE:       Original            LATEST INFO RECEIVED: 09/17/1998
SEC. PARTY: MALLINCKRODT INC, ST LOUIS, MO   FILED WITH: SECRETARY OF
DEBTOR:     VECTOR CORPORATION                           STATE/UCC DIVISION,
                                                         IA
--------------------------------------------------------------------------------
COLLATERAL: Leased Equipment and proceeds
```

```
FILING NO: P183247                    DATE FILED:              04/26/2001
TYPE:      Original                   LATEST INFO RECEIVED:    05/03/2001
SEC. PARTY: CENTRAL LEASING (USA) INC.,  FILED WITH: SECRETARY OF
            FLORENCE, KY                             STATE/UCC DIVISION,
DEBTOR:    VECTOR CORPORATION                        IA
------------------------------------------------------------------------
COLLATERAL: Leased Equipment and products
FILING NO: 1809187                    DATE FILED:              12/29/1997
TYPE:      Original                   LATEST INFO RECEIVED:    02/17/1998
SEC. PARTY: NORWEST EQUIPMENT FINANCE, INC.,  FILED WITH: SECRETARY OF
            MINNEAPOLIS, MN                             STATE/UCC DIVISION,
DEBTOR:    VECTOR CORPORATION                           NJ
------------------------------------------------------------------------
COLLATERAL: Leased Equipment and products
FILING NO: K885012                    DATE FILED:              12/24/1997
TYPE:      Original                   LATEST INFO RECEIVED:    01/13/1998
SEC. PARTY: NORWEST EQUIPMENT FINANCE, INC.,  FILED WITH: SECRETARY OF
            MINNEAPOLIS, MN                             STATE/UCC DIVISION,
DEBTOR:    VECTOR CORPORATION                           IA
------------------------------------------------------------------------
```

The public record items contained in this report may have been
paid, terminated, vacated or released prior to the date this
report was printed.

```
========================================================================
```
BUSINESS BACKGROUND

HISTORY
```
------------------------------------------------------------------------
```
CORPORATE AND BUSINESS REGISTRATIONS REPORTED BY THE SECRETARY
OF STATE OR OTHER OFFICIAL SOURCE AS OF 05/18/2001:

```
BUSINESS TYPE: Corporation -      DATE INCORPORATED: 08/01/1972
               Profit             STATE OF INCORP:   Iowa

AUTH SHARES-COMMON:  1,000,000
COMMON STOCK ISSUED: 0
```
```
------------------------------------------------------------------------
```
06/01/01
```
JERRY ZAHRADNIK, PRESIDENT-       STEVE JENSEN, VICE PRESIDENT-
SECRETARY                         FINANCE-ADMIN
DICK WHITMORE, VICE PRESIDENT     GREG SMITH, VICE PRESIDENT-
                                  ENGINEERING
DIRECTOR(S):  THE OFFICER(S)
```

Business started 1972 by Jerry Zahradnik, William Bergman and
Thomas Barnidge. Present control succeeded Dec 1997.  88% of capital
stock is owned by the parent company.  12% of capital stock is owned
by the officers.
    100% of the capital stock is owned by Jerry Zahradnik, William
Bergman and Thomas Barnidge.
    JERRY ZAHRADNIK born 1940.  1964-72 employed by Cherry Burrell
Corp, Cedar Rapids, IA as product manager.  1972-present active here
as president.
    STEVE JENSEN born 1954.  Joined this business in 1982.  Was
employed by Mc Gladrey & Pullen, Cedar Rapids, IA 1977-82.  Graduated
from University of Northern Iowa 1977.  Is a certified public
accountant.
    DICK WHITMORE.  1980-present.  1973-1980 employed by Lefebure,

Cedar Rapids, IA.
          GREG SMITH.  1996-present active here.  Graduated from Iowa State
University with a degree in Electrical Engineering.

                              OPERATIONS

06/01/01
          Foreign parent is Freund Industrial Company Ltd, Tokyo, Japan.
DUNS number is 69-062-5405.  Reference is made to that report for
background information on the parent and its management.
          Engaged in the design and manufacturing of machinery (used in the
pharmaceutical, food, seed, dry material, confectionary and snack
industries) on a custom basis used for processing tablet and powder
materials (and includes a coating and drying process).
Terms on larger orders are generally 1/3rd down on order, 1/3rd due
prior to shipment and balance due net 30 days.  On smaller orders
terms are net 30 days.  Has 700 account(s).  Export sales are on a
letter of credit basis. Sells to the pharmaceutical and food industry,
also industrial concerns. Territory : Worldwide.  Exports represent
30% of total volume.
Nonseasonal.
          EMPLOYEES:  120 which includes officer(s) and 3 part-time.   100
employed here.
               FACILITIES:  Owns 75,000 sq. ft. in a two story steel building.
               LOCATION:  Industrial section on side street.
               BRANCHES:  Operates a laboratory in Cranbury, NJ.  Branch
location was expanded from 3,200 sq. ft. to 16,000 sq. ft. in 1997.
It operates as a contract manufacturer for the pharmeutical industry.
               SUBSIDIARIES:  This business has one subsidiary listed below.
Coating Machinery Systems Inc, Huxley, IA.  Acquired 1995.  Assembles
and wholesales film coating equipment.  100% owned.  Intercompany
relations include shared management.  No financial information is
available for this company.  DUNS # 78-536-0108.

                         OTHER CORPORATE DETAILS
CORPORATE STATUS:  ACTIVE
CORPORATE AGENT:   GERALD R ZAHRADNIK, 675 44TH ST, MARION, IA
STATE ID NO:       000042104


=========================================================================
FINANCIAL SUMMARY

                         KEY BUSINESS RATIOS

NOTE:
D&B has been unable to obtain sufficient financial information from this
company to calculate business ratios.  Our check of additional outside sources
also found no information available on its financial performance.


To help you in this instance, ratios for other firms in the same industry are
provided below to support your analysis of this business.

                 (Industry Norms Based on 109 Establishments)

| Profitability % | | Short-Term Solvency | | Efficiency (%) | Utilization (%) |
|---|---|---|---|---|---|
| Return on Sales | Return on Net Worth | Curr Ratio | Quick Ratio | Assets/ Sales | Total Liabs/ Net Worth |

DBREPORTS-062761010-CR-45313921K

| Firm | UN | UN | UN | UN | UN | UN |
|---|---|---|---|---|---|---|
| Industry Median | 4.5 | 15.2 | 2.1 | 1.1 | 59.4 | 96.4 |
| Industry Quartile | UN | UN | UN | UN | UN | UN |

UN = Unavailable

06/01/01    On MAY 31 2001 Steve Jensen, Vice President, referred to the
        above figures as still representative.
            He submitted the following partial estimates dated JUN 01 2001:
            Sales for fiscal 2000 were $14,000,000.
            On June 1, 2001, Steve Jensen, Vice President, stated the sales
        for fiscal year-end 2001 are estimated to reach $17,000,000.
            As of June 1, 2001, a search of Dun & Bradstreet's Public Record
        Database found no open suits, liens or judgements to which this
        company was named defendant or debtor.  Public records received
        hereafter will be entered into the Database.

===============================================================================
CUSTOMER SERVICE
If you need any additional information, or have any questions regarding this
report, please call our Customer Service Center at (800) 234-3867 from
anywhere within the U.S.  From outside the U.S., please call your local D&B
office.

                    END OF COMPREHENSIVE REPORT
** End of CR **

© 2001 Dun & Bradstreet, Inc.
Refer comments or questions to customer service.

*Gladish v. Tyco Toys Inc.* 29 USPQ2d

short, Plaintiff has failed to show, by reference to materials on file, that there indeed is a material issue of fact regarding the Pimental device. Therefore, in concurrence with the special Master's Final Report, this Court finds that the Pimental device is prior art and that Plaintiff is precluded from enforcing the rights under its '733 Patent.

*Howell Device*

Because this Court has determined that Plaintiff's '733 Patent is nullified by the Pimental device, it need not decide the effect of the '733 Patent with respect to the Howell device.

*Conclusion*

THE COURT has considered the Motion and the pertinent portions of the record, and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that the said Motion be, and the same is hereby GRANTED. Summary judgment is granted in favor of Defendant and against Plaintiff. The Clerk of Court SHALL CLOSE the CASE and DENY all pending motions as MOOT.

---

**District Court, E.D. California**

**Gladish v. Tyco Toys Inc.**

No. CIV. S-92-1666WBS/JFM

---

tions omitted] ... if a mere allegation of experimental intent were sufficient, there would rarely if ever be room for summary judgment based on a true 'on sale' defense under 35 U.S.C. §102(b).

*D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1150 [219 USPQ 13] (Fed. Cir. 1983), *cert. denied*, 474 U.S. 825, 106 S.Ct. 83, 88 L.Ed.2d 68. Plaintiff has set forth no facts indicating an ability to show that the Pimental device was experimental.

Plaintiff also argues that Pimental's "sales" were never proved. Even if this Court were to discount Mr. Pimental's sworn testimony that sales of the Pimental devices were made, the relevant statutory language is that a device be "on sale", not that it had been sold. 35 U.S.C. §102(b); see also *A.B. Chance Co.*, supra.

Decided September 16, 1993

PATENTS

1. **Practice and procedure in Patent and Trademark Office — Re-examination — In general (§110.1301)**

JUDICIAL   PRACTICE   AND PROCEDURE

**Procedure — Stays — In general (§410.2901)**

Stay of patent infringement action pending Patent and Trademark Office's re-examination of patent in suit is not warranted, even though infringement action has been pending for only 11 months, in view of defendant's showing that it would be prejudiced in its discovery efforts should stay be granted, in view of fact that re-examination will not finally resolve all issues in litigation, and in view of plaintiff's failure to show hardship caused by denial of stay.

**Particular patents — General and mechanical — Toys**

5,100,327, Gladish, method and apparatus for teaching vehicle safety, plaintiff's motion for stay pending re-examination denied.

Action by William C. Gladish against Tyco Toys Inc., Bob's Toyland/Carousel Toys, and Toys-R-Us, for patent infringement. On plaintiff's motion to stay pending re-examination of his patent. Motion denied.

David J. Brezner, Richard P. Doyle, and Laura L. Kulhanjian, of Flehr, Hohbach, Test, Albritton & Herbert, San Francisco, Calif., for plaintiff.

Breton A. Bocchieri, Steven E. Shapiro, and Miriam C. Beezy, of Poms, Smith, Lande & Rose, Los Angeles, Calif.; Peter F. Samuel, of Samuel, Shafie & Samuel, Fair Oaks, Calif., for Tyco Toys Inc. and Bob's Toyland/Carousel Toys.

Bruce E. Leonard, of Caulfield, Davies & Donohue, Sacramento, Calif., for Toys R Us.

Shubb, J.

Plaintiff William Gladish moves to stay this action pending reexamination of his patent by the Patent and Trademark Office ("PTO").

## BACKGROUND

In this action, plaintiff asserts that Certain instructional toy cars sold by defendants (collectively, "Tyco") infringe his U.S. Patent No. 5,100,327 (the "'327 patent"). In investigating plaintiff's claims, Tyco discovered several prior art references not considered by the PTO during the examination process of the '327 patent application, which, Tyco asserts, indicate that the patent was improvidently granted. *See* Brezner Decl., ¶ II.

The reexamination process is provided for by 35 U.S.C. § 301 *et seq.* Section 302 provides that "[a]ny person at any time may file a request for reexamination by the [PTO] of any claim of a patent on the basis of any prior art ..." 35 U.S.C. § 302. The request must set forth the "pertinency and manner of applying cited prior art to every claim for which reexamination is requested." *Id.* The Commissioner must determine within three months of the request whether it raises a "substantial new question of patentability affecting any claim of the patent ..." 35 U.S.C. § 303(a). The determination is made on the basis of printed publications and patents cited under § 301. 37 C.F.R. section 1.552(a). If a substantial new question of patentability is raised, the patent will be reexamined. 35 U.S.C. § 304. Section 305 then provides that all reexamination proceedings "will be conducted with special dispatch."

## LEGAL STANDARD

Determining the appropriateness of a stay of district court proceedings pending the outcome of the reexamination proceeding rests in the sound discretion of the district court. *Gould v. Control Laser Corp.,* 705 F.2d 1340 [217 USPQ 985] (Fed. Cir.), *cert. denied,* 464 U.S. 935 [220 USPQ 385] (1983) (stay pending reexamination not a reviewable final decision); *Hewlett-Packard Co. v. Acuson Corp.,* 1993 WL 149994 at *1 (N.D.Cal. 1993); *Emhart Industries, Inc. v. Sankyo Seiki Mfg. Co., Ltd.,* 3 U.S.P.Q.2d 1889 (N.D. Ill. 1987). The court must weigh the competing interests presented by a particular set of facts. *See Acuson Corp.,* 1993 WL 149994 at *1. Among the considerations to be balanced are hardships to the parties resulting from the granting or denial of the stay as well as "the orderly course of justice measured in terms of simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Id.* (citing *Filtrol Corp. v. Kelleher,* 467 F.2d 242, 244 [175 USPQ 400] (9th Cir.

1972), *cert. denied,* 409 U.S. 1110 [176 USPQ 193] (1973)).

One of the purposes of the reexamination procedure is to conserve judicial resources. The procedure serves to "eliminate trial [of the issue of patent claim validity] (when the claim is canceled) or to facilitate trial of the issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceeding)." *Ingo v. Tyco Industries, Inc.,* 227 U.S.P.Q. 69, 71 (N.D.Ill. 1985) (quoting *Gould,* 705 F.2d at 1342).

Courts which have denied stays pending reexamination of the patent's validity have generally done so where the request for reexamination came late in the litigation proceedings, after extensive discovery or trial preparation. *See, e.g., Freeman v. Minnesota Mining & Manufacturing Co.,* 4 U.S.P.Q.2d 1574 (D.Del. 1987) (stay inappropriate where discovery had been concluded and reexamination would center on the issue of whether certain documents constituted publications rather than on issues involving the special expertise of the PTO); *Toro Co. v. L.R. Nelson Corp.,* 223 U.S.P.Q. 636, 638 (C.D.Ill. 1984) (stay denied where suit had been pending for almost 3½ years and the court had under advisement a motion by defendant for summary judgment possibly dispositive of the issue of validity).

## DISCUSSION

Defendants object to a stay of the proceedings on numerous grounds. Tyco raises serious questions about plaintiff's good faith in requesting reexamination, maintaining that the prior art which is the basis of plaintiff's request for reexamination has been known to plaintiff's counsel since April, 1992. Instead of requesting a reexamination at that point, plaintiff chose to file this action six months later, in October of 1992. Plaintiff additionally filed a motion for preliminary injunction, on October 22, 1992, seeking to restrain further production, sales, and advertising of Tyco's "Incredible Crash Dummies" product line. That motion raised issues of the patent's validity in light of three prior art references, the same references plaintiff now seeks to have considered in his request for reexamination.[1] The preliminary injunction motion subsequently was withdrawn pursuant to stipulation.

---

[1] Plaintiff has requested reexamination of his '327 patent in light of three prior art references: Barbie, Crash Kramer and Iowa DOT. Reply, p. 7 n. 6.

Tyco has shown that it would suffer prejudice in its discovery efforts should the stay be granted. Plaintiff has engaged in extensive discovery of Tyco. Tyco's discovery has developed to the point that it is necessary to take depositions. With much of the evidence sought, the issue of dates is critical, and Tyco contends that witnesses may become unavailable, their memories may fade, and evidence may be lost while the PTO proceeding takes place. Further, the case is nearing the discovery cut-off date of December 1, 1993, and Tyco represents that a summary judgment motion will be forthcoming.

[1] The reexamination proceeding will not finally resolve all the issues in the litigation. Tyco has uncovered evidence of prior public use and prior conception which is material to a court's determination of validity, but which does not fall into the narrow categories the PTO considers on a request for reexamination, namely prior publications and patents. As a result, this court is the only forum for a complete consideration of Tyco's evidence of invalidity. Unless all claims of the patent were cancelled as a result of the reexamination, validity would remain a contested issue in this action, as not all the prior references material to a determination of validity would have been considered by the PTO. Two additional issues would remain: (1) infringement, and (2) whether the case is exceptional such that defendants are entitled to fees and costs. Accordingly, issuance of a stay pending reexamination would not serve Congress' intent of simplifying the issues and reducing the complexity of the trial. *See Enprotech Corp. v. Autotech Corp.,* 15 U.S.P.Q.2d 1319 (N.D.Ill. 1990) (stay denied where reexamination would not resolve all issues in the litigation). After the reexamination, the parties would be right back in this court.

Tyco has a strong interest in concluding this lawsuit without delay. The reexamination procedure can take a year and involve appeals before appellate tribunals of the PTO and the Court of Appeals for the Federal Circuit. Tyco's customers apparently are informed that plaintiff claims infringement; its biggest customer, Toys R Us, is also named as a defendant.

Plaintiff chose this forum, forced Tyco to expend time and money in responding to a motion for preliminary injunction and a motion for sanctions, and now, after the litigation has progressed almost a year and Tyco's discovery efforts are bearing fruit, seeks reexamination of his patent based on prior references known to plaintiff since April of 1992. Plaintiff has not set out a case of hardship should the stay be denied. Under the circumstances, the court concludes that the issuance of a stay would be unfair to defendants. *See Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516 [20 USPQ2d 1718] (E.D.Wash. 1991) (stay unwarranted because plaintiff instituted action, notified customers of the suit, allowed defendant to conduct extensive discovery).

IT IS THEREFORE ORDERED that plaintiff's motion for a stay of this action pending reexamination of the validity of his patent by the PTO be, and the same is hereby DENIED.

820 F.2d 384
2 U.S.P.Q.2d 1926
**(Cite as: 820 F.2d 384)**
▶

United States Court of Appeals,
Federal Circuit.

H.H. ROBERTSON, COMPANY, Plaintiff/
Appellee,
v.
UNITED STEEL DECK, INC. and Nicholas J.
Bouras, Inc., Defendants/Appellants.

No. 86-1410.

May 27, 1987.

Patent owners brought infringement action relating to patent on bottomless sub-assembly for producing underfloor electrical cable trench, and moved for preliminary injunction against alleged infringers. The United States District Court for the District of New Jersey, Dickinson R. Debevoise, J., granted motion, and alleged infringers appealed. The Court of Appeals, Pauline Newman, Circuit Judge, held that: (1) District Court did not err in refusing to reopen proceedings which resulted in grant of preliminary injunction against alleged infringers in order to consider reference proffered by alleged infringers after preliminary injunction was issued; (2) even where irreparable injury is presumed and not rebutted, it is still necessary to consider balance of hardships in determining whether preliminary injunction is appropriate remedy in patent infringement action; and (3) District Court did not abuse its discretion in granting preliminary injunction against alleged infringers.

Affirmed.

West Headnotes

[1] Patents ⬮⇒294
291k294 Most Cited Cases

Standards applied to grant of preliminary injunction are no more or less stringent in patent cases than in other areas of law.

[2] Patents ⬮⇒295
291k295 Most Cited Cases

Burden or proving invalidity of patent is with party attacking validity; evidence adduced in connection with motion for preliminary relief must be

considered in this light.

[3] Patents ⬮⇒297(2)
291k297(2) Most Cited Cases

Substantial weight may be given to patent's litigation history in connection with motion for relief pendente lite; prior adjudication upholding patent validity after fully litigated trial, including similar issues of fact and law, contributes strong support to grant of preliminary injunction.

[4] Patents ⬮⇒295
291k295 Most Cited Cases

District court's conclusion that holder of patent had demonstrated reasonable likelihood that it would prevail on issue of patent validity was not erroneous, where conclusion was based upon its determination that accused infringers in different case failed to establish invalidity of claims, which were at issue in current case; thus, injunction pendente lite, which enjoined alleged infringers from making, using and selling certain structures which were found to infringe patent on concrete deck structure sub-assembly for distributing electrical wiring, was properly issued.

[5] Patents ⬮⇒308
291k308 Most Cited Cases

District court did not err in refusing to reopen proceedings which resulted in grant of preliminary injunction against alleged infringers, based upon "newly identified" reference, where that patent was issued over 30 years ago, and was not offered as newly discovered evidence.

[6] Patents ⬮⇒324.5
291k324.5 Most Cited Cases

Reference offered by alleged infringers to district court after district court granted preliminary injunction against alleged infringers was not properly before Court of Appeals, and could not be considered on appeal, where reference, though placed in record by district court, was not subject of testimony or any other form of evaluation by district court.

[7] Patents ⬮⇒324.55(1)

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

291k324.55(1) Most Cited Cases

Claim construction is reviewed as matter of law; however, interpretation of claim may depend on evidentiary material about which there is factual dispute, requiring resolution of factual issues as basis for interpretation of claim.

[8] Patents ☞294
291k294 Most Cited Cases

Grant of preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting viewpoint of accused infringers;  grant turns on likelihood that patent holder will meet its burden at trial proving infringement.

[9] Patents ☞298
291k298 Most Cited Cases

District court properly concluded that there was reasonable probability that patent holder for bottomless sub-assembly for producing underfloor electrical cable trench would eventually establish that alleged infringers induced infringement of patent, despite expert testimony presented by alleged infringers supporting claim that their trenches were only partially bottomless.

[10] Patents ☞300
291k300 Most Cited Cases

In matters involving patent rights, irreparable harm, as required for preliminary injunction against alleged infringers, is presumed when clear showing has been made of patent validity and infringement;  this presumption derives in part from finite term of patent grant, as patent expiration is not suspended during litigation and passage of time can work irremediable harm.

[11] Patents ☞293.1
291k293.1 Most Cited Cases
        (Formerly 291k293)

Nature of patent grant weighs against holding that monetary damages will always suffice to make infringed patentee whole, in that principal value of patent is at statutory right to exclude.

[12] Patents ☞300
291k300 Most Cited Cases

Even where irreparable injury is presumed and not rebutted in patent infringement action seeking preliminary injunction against alleged infringers, it is still necessary to consider balance of hardships;  magnitude of threatened injury to patent owner is weighed, in light of strength of showing of likelihood of success on merits, against injury to accused infringer if preliminary decision is in error.

[13] Patents ☞324.5
291k324.5 Most Cited Cases

Grant of preliminary injunction against alleged patent infringer, if not based on legal error or serious misjudgment of evidence, is reviewable only to ascertain whether grant was within reasonable range of discretion.

[14] Patents ☞294
291k294 Most Cited Cases

District court did not abuse its discretion in issuing preliminary injunction against alleged patent infringers of bottomless sub-assembly for producing underfloor electrical cable trench, under equitable considerations, where patent did not have many more years to run, though alleged infringers claimed that it would lose business and lose jobs as result of grant of injunction.
 *386 John G. Gilfillan, III, Carella, Byrne, Bain & Gilfillan, Roseland, N.J., argued, for defendants/ appellants.

 Arland T. Stein, Reed Smith Shaw & McClay, Pittsburgh, Pa., argued, for plaintiff/appellee.  With him on the brief, were Joseph W. Klein and Michael J. Kline.  Also on the brief were Michael P. Griffinger and Ann M. McCormick, Crummy, Del Deo, Dolan, Griffinger and Vecchione, Newark, N.J.

 Before NEWMAN and BISSELL, Circuit Judges, and NEWMAN, Senior Judge. [FN*]

        FN* The Honorable Bernard Newman, Senior
        Judge, United States Court of International Trade,
        sitting by designation.

 PAULINE NEWMAN, Circuit Judge.

 United Steel Deck, Inc. (USD) and Nicholas J. Bouras, Inc., (Bouras) appeal the Order of

Preliminary Injunction of the United States District Court for the District of New Jersey in favor of the H.H. Robertson Company (Robertson). USD and Bouras were enjoined pendente lite from making, using, and selling certain structures which were found to infringe United States Patent No. 3,721,051 (the '051 or Fork patent). *H.H. Robertson Co. v. United Steel Deck, Inc.,* No. 84-5357 (D.N.J. March 31, 1986). We affirm.

### Background

Robertson is the owner of the '051 patent, invention of Frank W. Fork, issued on March 20, 1973 and entitled "Bottomless Sub-Assembly for Producing an Underfloor Electrical Cable Trench". The invention is a concrete deck structure sub-assembly for distributing electrical wiring. A detailed description of the invention and its development appears in *H.H. Robertson Co. v. Bargar Metal Fabricating Co.,* 225 USPQ 1191, 1192-96 (N.D. Ohio 1984), [Available on WESTLAW-DCT database] and need not be repeated.

Robertson charged Bouras and its affiliated manufacturing company USD with infringement (inducing and contributory infringement) of claims 1, 2, 4, 6, 9, 13, and 14 of the Fork patent. In moving for preliminary injunction Robertson alleged that "there is a reasonable probability of eventual success on the patent infringement claim"; that "the Fork patent was held valid, infringed, contributorily infringed and enforceable by the United States District Court for the Northern District of Ohio in ... *Bargar* "; that the "accused structures of USD and Bouras are the same or substantially the same as those held ... to infringe in *Bargar* "; that "[w]here, as here, the patent has been held valid and infringed, irreparable harm is presumed ... and the harm ... cannot be fully compensated by money damages"; and that the "balance of equities heavily weighs in favor of Robertson."

The district court held a four-day hearing on the motion, during which witnesses including experts testified on the issues of patent validity and infringement. The legal and equitable issues were briefed and argued. The court concluded that Robertson had "established a basis for the relief it seeks," and granted the preliminary injunction. *Robertson,* slip op. at 25.

### Analysis

Injunctive relief in patent cases is authorized by statute:

> \*387 The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.

35 U.S.C. § 283. *See generally Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1577-79, 219 USPQ 686, 689-90 (Fed Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687, 220 USPQ 385 (1983).

[1] The standards applied to the grant of a preliminary injunction are no more nor less stringent in patent cases than in other areas of the law. The court in *Smith International* discussed the so-called "more severe" rule that has at times weighed against the grant of preliminary injunctions in patent cases, stating: "The basis for the more severe rule appears to be both a distrust of and unfamiliarity with patent issues and a belief that the ex parte examination by the Patent and Trademark Office is inherently unreliable." *Id.* at 1578, 219 USPQ at 690. *See also Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233, 227 USPQ 289, 292 (Fed.Cir.1985) ("burden upon the movant should be no different in a patent case than for other kinds of intellectual property"). The existing standards for relief pendente lite, fairly applied, can accommodate any special circumstances that may arise.

The grant or denial of a preliminary injunction is within the discretionary authority of the trial court. Appellate review is on the basis of whether the court "abused its discretion, committed an error of law, or seriously misjudged the evidence." *Smith International,* 718 F.2d at 1579, 219 USPQ at 691. *See also Roche Products, Inc. v. Bolar Pharmaceutical Co.,* 733 F.2d 858, 865, 221 USPQ 937, 942 (Fed Cir.), *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117, 225 USPQ 792 (1984) ("trial court ... has considerable discretion in determining whether ... to issue an injunction").

The district court applied to Robertson's motion the Third Circuit standard:

> An applicant for a preliminary injunction against patent infringement must show:
> ... (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be

irreparably injured *pendente lite* if relief is not granted.... Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."
*E.g., Eli Lilly and Co. v. Premo Pharmaceutical Labs., Inc.,* 630 F.2d 120, 136 (3d Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

*Robertson,* slip op. at 11. In *Eli Lilly* the Third Circuit applied to a patent case the "well settled" standard set forth in the (non-patent) case *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814-15 (3d Cir.1978). This is substantially the same standard enunciated by this court. See, for example, *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1270-73, 225 USPQ 345, 347-50 (Fed.Cir.1985), and *Atlas Powder,* 773 F.2d at 1231-34, 227 USPQ at 290-93.

### *Patent Validity*

The first question before the district court was whether the movant Robertson had demonstrated a reasonable likelihood that USD and Bouras would fail to meet their burden at trial of proving, by clear and convincing evidence, that the Fork patent claims were invalid.

[2] The burden of proving invalidity is with the party attacking validity. *See Roper Corp.,* 757 F.2d at 1270, 225 USPQ at 347 (in a preliminary injunction case the burden of establishing invalidity remains on the challenger). The evidence adduced in connection with a motion for preliminary relief must be considered in this light.

Robertson retained the burden of showing a reasonable likelihood that the attack on its patent's validity would fail. Indeed, the district court placed a greater burden on Robertson than was required, referring **388 to our statement in *Atlas Powder,* 773 F.2d at 1233, 227 USPQ at 292, that a patentee seeking a preliminary injunction must " 'clearly show[ ]' that its patent is valid".

This court's statement in *Atlas Powder* does not change the immutable allocation to the challenger of the burden of proving invalidity, but rather reflects

the rule that the burden is always on the movant to demonstrate entitlement to preliminary relief. Such entitlement, however, is determined in the context of the presumptions and burdens that would inhere at trial on the merits. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), wherein the Court observed that in deciding a motion for summary judgment the trial court must be cognizant of "the substantive evidentiary standard of proof that would apply at the trial on the merits". A similar cognizance is appropriate to a motion for preliminary injunction.

Before the district court, USD and Bouras argued that all of the Fork patent claims at issue were invalid for obviousness in terms of 35 U.S.C. § 103, and that claim 2 was invalid in terms of 35 U.S.C. § 112. The asserted invalidity for obviousness was based on references that had been before the Ohio court in *Bargar,* including references that had been before the patent examiner during prosecution of the Fork patent application, and three references that were newly presented. The patent claims, the details of the references, and the evidence and argument offered by both sides, need not be here repeated.

The district court in its opinion referred to the detailed analysis by the Ohio court and to its decision that the accused infringers in that case had failed to establish the invalidity of the claims. The district court stated that the "finding of validity of the Fork '051 patent in *Bargar* is persuasive evidence of validity" with respect to the references before that court. *Robertson,* slip op. at 14-17. The district court further held, upon reviewing the three additional references, that "considering them as part of the prior art does not render obvious the Fork bottomless trench invention." *Id.* We discern no error in the court's conclusion that "the finding in *Bargar* and the evidence submitted in the present case lead to the conclusion that there is a reasonable probability that Robertson will ultimately succeed on the issue of obviousness". *Id.* at 17.

The issue of validity of claim 2 under section 112 raised the question of whether the written description was enabling to one skilled in this art. Reviewing the evidence, including expert testimony, the district court held that "the patent requirements of § 112 are met". *Id.* at 18-19. The court's determination that the disclosure had not been proven not to be enabling has not been shown to be in error.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[3] Bouras accuses the district court of giving undue weight to the Ohio court's decision of validity and infringement against a different defendant. The district court stated that it "did not rely on *Bargar* as evidence of infringement" but only as evidence of validity with respect to the references actually considered by the Ohio court. *Id.* at 14-17, 20. There was no error in its so doing. Substantial weight may be given to a patent's litigation history in connection with a motion for relief pendente lite. *Atlas Powder,* 773 F.2d at 1232, 227 USPQ at 291; *Smith International,* 718 F.2d at 1579, 219 USPQ at 691. Even the "severe rule" against the grant of preliminary injunctions in patent cases was tempered when a patent had been upheld in other forums or its validity had been acquiesced in by others. *See* 8 A.W. Deller, *Deller's Walker on Patents* § 686, 416-22 (2d ed. 1973 & Supp.1985) and cases cited therein. A prior adjudication upholding patent validity after a fully litigated trial, including similar issues of fact and law, contributes strong support to the grant of a preliminary injunction.

[4] The decision for our review is not a final judgment of patent validity. Rather, we ascertain whether the district court correctly concluded that Robertson had demonstrated a reasonable likelihood that it will prevail on this issue. On the record before us, the court's conclusion is based on factual findings that have not been *389 shown to be clearly erroneous, it was not error to place weight on the Ohio district court's ruling on validity, and no error in law has been shown.

### The Wiesmann Patent

Following the district court's grant of the preliminary injunction, USD and Bouras moved for a stay, requesting additional discovery and a supplemental hearing for the purpose of presenting a "newly identified" reference, U.S. Patent No. 2,680,775 (the Wiesmann patent) assigned to Robertson, which USD and Bouras stated was significant to the issue of validity. Robertson reports that this patent had issued on June 6, 1954 and that it was not offered as newly discovered evidence, and argues that in any event this patent if considered would not change the result.

[5] The district court denied the motion, but held that this reference "is considered to be part of the record of this matter although not considered substantively by the Court". *H.H. Robertson Co. v.*

*United States Steel Deck, Inc.,* No. 84-533F (D.N.J.) (Order of May 27, 1986). There was no error in the district court's refusal to reopen the proceedings or otherwise to consider the reference, in the circumstances.

[6] USD and Bouras ask this court to consider the Wiesmann patent in full substance. They argue that because this reference had first been offered to the district court it is not in fact presented for the first time on appeal. But this reference, although placed in the record by the district court, was not the subject of testimony or any other form of evaluation by that court. Initial consideration of evidence is not the appellate role. *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 1581 n. 6, 220 USPQ 1, 7 n. 6, (Fed.Cir.1984). The reference is not properly before us and has not been considered.

### Infringement

The accused structures are described by the buildings in which they have been installed: the Maiden Lane, the Daily News, and the Blue Cross-Blue Shield. USD and Bouras argue that their current trench, the Blue Cross-Blue Shield design, is not "truly bottomless", and that the claims must be interpreted as a matter of law to exclude trenches that are only partially bottomless. To the district court USD and Bouras presented expert testimony in support of this position, countered by expert testimony on behalf of Robertson. The witnesses testified at length concerning the prosecution history and its impact on the interpretation and scope of the claims.

[7] Claim construction is reviewed as a matter of law. *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983). However, interpretation of a claim may depend on evidentiary material about which there is a factual dispute, requiring resolution of factual issues as a basis for interpretation of the claim. *See Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656, 229 USPQ 992, 995 (Fed.Cir.1986); *Palumbo v. Don-Joy Co.,* 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985). In this case, there was extensive testimony on the issue of claim construction, including the conflicting views of experts on both legal and factual questions. Those factual considerations that are pertinent to the district court's construction of the term "bottomless" are reviewed under the clearly erroneous standard.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The district court's construction of the claims is explained in relation to its holding on infringement, the court stating that the "key portion of the trench remains bottomless, *i.e.,* the portions giving direct access to the cells." *Robertson,* slip op. at 22.  We are not persuaded of error in the district court's construction of the term "bottomless" to apply to the "key portion" of the trench, based on the evidence before it.

The accused structures, and the application thereto of the patent claims, were the subject of analysis and explanation by witnesses on both sides, aided by the physical exhibits.   Our review shows thorough exposition of the opposing positions.   The district court found that the accused subassemblies are "bottomless in that upper surface portions of the cellular units of the *390 metal subfloor in the region between said opposite sides cooperate with the sub-assembly to create an underfloor electrical cable trench, confront the cover plate, and are exposed to view when the cover plate is removed." *Id.* at 21.   The court found that "the horizontal metal sections ... and the horizontal metal strip ... serve no function [and the] key portion of the trench remains bottomless." *Id.* at 21-22.

In its factual application of the claims to the accused devices, the findings of the district court have not been shown to be clearly in error.

[8][9] The grant of a preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer. *Atlas Powder,* 773 F.2d at 1233, 227 USPQ at 292.   The grant turns on the likelihood that Robertson will meet its burden at trial of proving infringement.   We sustain the district court's conclusion that "there is a reasonable probability that Robertson will eventually establish that Bouras and USD induced infringement of the Fork '051 patent". *Robertson,* slip op. at 23.

*Equitable Considerations*

The movant for preliminary injunction must show not only a reasonable likelihood of success on the merits, but also the lack of adequate remedy at law or other irreparable harm.

[10] In matters involving patent rights, irreparable harm has been presumed when a clear showing has been made of patent validity and infringement.

*Smith International,* 718 F.2d at 1581, 219 USPQ at 692.    This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.   The opportunity to practice an invention during the notoriously lengthy course of patent litigation may itself tempt infringers. *Teledyne Industries, Inc. v. Windmere Products, Inc.,* 433 F.Supp. 710, 739- 40, 195 USPQ 354, 378 (S.D.Fla.1977).

[11] The nature of the patent grant thus weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude. *See Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1548, 220 USPQ 193, 198 (Fed.Cir.1983) ("right to exclude recognized in a patent is but the essence of the concept of property").    The presumption of irreparable harm in patent cases is analogous to that applicable to other forms of intellectual property, as discussed in *Roper Corp.,* 757 F.2d at 1271-72, 225 USPQ at 348.

The district court held that irreparable injury was presumed because Robertson had established a "strong likelihood of success in establishing validity and infringement." *Robertson,* slip op. at 24.   Such presumption of injury was not, however, irrebuttable. *Roper Corp.,* 757 F.2d at 1272, 225 USPQ at 349 (the presumption "is rebuttable by clear evidence").    The parties gave scant attention in their appellate briefs to the issues of irreparable injury and the balance of harms.    During oral argument, in response to an inquiry from the bench, USD and Bouras urged that money damages are an adequate remedy.    In response, Robertson emphasized the few remaining years of patent life.

[12] Even when irreparable injury is presumed and not rebutted, it is still necessary to consider the balance of hardships. *Datascope Corp. v. Kontron Inc.,* 786 F.2d 398, 401, 229 USPQ 41, 42 (Fed.Cir.1986).    The magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of likelihood of success onthe merits, against the injury to the accused infringer if the preliminary decision is in error. Results of other litigation involving the same patent may be taken into account, and the public interest is considered.    No one element controls the result. *Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952, 956-60, 224 USPQ 252, 255-59 (Fed.Cir.1984)

820 F.2d 384
(Cite as: 820 F.2d 384, *390)

When the movant has shown the likelihood that the acts complained of are unlawful, the preliminary injunction "preserves the status quo if it prevents future trespasses *391 but does not undertake to assess the pecuniary or other consequences of past trespasses." *Atlas Powder Co.,* 773 F.2d at 1232, 227 USPQ at 291. The court in *Atlas Powder* thus distinguished between remedies for past infringement, where there is no possibility of other than monetary relief, and prospective infringement, "which may have market effects never fully compensable in money." *Id.* The cautionary corollary is that a preliminary injunction improvidently granted may impart undeserved value to an unworthy patent.

Thus substantial deference is due the district court's equitable judgment. The district court in its opinion referred to the USD/Bouras portrayal of disruption, loss of business, and loss of jobs, *Robertson,* slip op. at 24, and to Robertson's business needs and patent rights. Observing that "[t]his patent does not have many more years to run", the court held "the equities weigh heavily against the wrongdoer." *Id.* The court stated that the "protection of patents furthers a strong public policy ... advanced by granting preliminary injunctive relief when it appears that, absent such relief, patent rights will be flagrantly violated." *Id.* at 24-25.

[13][14] The grant of a preliminary injunction, if not based on legal error or a serious misjudgment of the evidence, is reviewable only to ascertain whether the grant was within a reasonable range of discretion. We have considered all of the arguments of the parties, and the record before us. The district court's conclusion reflects a reasonable consideration and balance of the pertinent factors, evaluated in accordance with the established jurisprudence, and does not exceed the court's discretionary authority.

AFFIRMED.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

KeyCite                                                                                    P

Date of Printing: JUN 04,

### KEYCITE

CITATION:   ► **H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 2 U.S.P.Q.2d 1926 (Fed.Cir.(N.J.), May 27, 19**
(NO. 86-1410)

#### History
#### Direct History

=>           1  **H.H. Robertson, Co. v. United Steel Deck, Inc.,** 820 F.2d 384, 2 U.S.P.Q.2d 1926
                 (Fed.Cir.(N.J.) May 27, 1987) (NO. 86-1410)

#### Negative Indirect History

*Abrogated by*

             2  Markman v. Westview Instruments, Inc., 52 F.3d 967, 63 USLW 2663, 34 U.S.P.Q.2d 1321
                 (Fed.Cir.(Pa.) Apr 05, 1995) (NO. 92-1049) (Additional History) ***

*Overruling Recognized by*

             3  Circle R, Inc. v. Smithco Mfg., Inc., 919 F.Supp. 1272 (N.D.Iowa Mar 20, 1996) (NO. C 96-4002-MWB)
             4  Bell & Howell Document Management Products Co. v. Altek Systems, 132 F.3d 701, 45 U.S.P.Q.2d 1033
                 (Fed.Cir.(Ill.) Dec 05, 1997) (NO. 97-1226), rehearing denied (Jan 06, 1998) (Additional History)
             5  Canon Computer Systems, Inc. v. Nu-Kote Intern., Inc., 134 F.3d 1085, 45 U.S.P.Q.2d 1355
                 (Fed.Cir.(Cal.) Jan 08, 1998) (NO. 97-1248, 97-1290) (Additional History) **
             6  Aoki Technical Laboratory, Inc. v. FMT Corp., 26 F.Supp.2d 319 (D.N.H. Mar 23, 1998)
                 (NO. CIV. 96-042-JD) (Additional History) **
             7  Aero Industries, Inc. v. John Donovan Enterprises-Florida, Inc., 80 F.Supp.2d 963 (S.D.Ind. Nov 22, 1999)
                 (NO. IP 99-0671 C-M/S) ***
             8  Dymo Costar Corporation v. Seiko Instruments USA, Inc., 2000 WL 502616 (D.Conn. Mar 20, 2000)
                 (NO. 3-00-CV-4) (Additional History) **
             9  Tate Access Floors v. Interface Architectural Resources, Inc., 132 F.Supp.2d 365 (D.Md. Feb 23, 2001)
                 (NO. CIV JFM-00-2543) **

*Abrogation Recognized by*

            10  Tyco Industries, Inc. v. Tiny Love, Ltd., 914 F.Supp. 1068 (D.N.J. Jan 23, 1996)
                 (NO. CIV.A. 95-1135 (HAA)) **

*Distinguished by*

            11  Nutrition 21 v. U.S., 930 F.2d 867, 59 USLW 2636, 18 U.S.P.Q.2d 1347 (Fed.Cir.(Wash.) Mar 29, 1991)
                 (NO. 90-1283), rehearing denied (May 20, 1991) (Additional History) **

© Copyright West Group 2001

1998 WL 1037920
(Cite as: 1998 WL 1037920 (M.D.N.C.))

**Page 2**

Only the Westlaw citation is currently available.

United States District Court, M.D. North Carolina.

REMINGTON ARMS COMPANY, INC., Plaintiff,
v.
MODERN MUZZLELOADING, INC., Defendant.

No. 2:97CV00660.

Dec. 17, 1998.

Christopher G. Daniel, Womble Carlyle Sandridge & Rice POD 84, Michael E. Ray, Womble Carlyle Sandridge & Rice POD 84, Winston-Salem, for Remington Arms Company, Inc., plaintiffs.

Daniel Alan M. Ruley, Bell, Davis & Pitt, P.A., James R. Fox, Bell, Davis & Pitt, P.A., William Kearns Davis, Bell, Davis & Pitt, P.A., Winston-Salem, Thad G. Long, Bradley, Arant, Rose & White, L.L .P., Birmingham, AL, Donald H. Zarley, Zarley McKee Thomte Voorhees & Sease, P.L.C., Des Moines, IA, Timothy J. Zarley, Daniel J. Cosgrove, Zarley McKee Thomte Voorhees & Sease, P.L.C., Des Moines, IA, Dennis L. Thomte, Zarley McKee Thomte Voorhees & Sease, P.L.C., Omaha, NE, for Modern Muzzleloading, Inc., defendants.

ORDER

OSTEEN, District J.

*1 For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's Motion To Stay District Court Proceedings Pending Reexamination [89] is denied.

MEMORANDUM OPINION

This matter comes before the court on Defendant's Motion to Stay District Court Proceedings Pending Reexamination.

For the reasons discussed herein, the court will deny Defendant's Motion to Stay District Court Proceedings Pending Reexamination.

I.     FACTUAL     AND     PROCEDURAL

BACKGROUND

On June 18, 1997, Plaintiff Remington Arms Company, Inc. (Remington), filed this lawsuit against Modern Muzzleloading, Inc. (Modern), alleging willful infringement of Plaintiff's U.S. Patent No. 5,606,817 entitled Muzzle- loading Firearm ('817 patent). (Pl.'s Resp. Mot. Stay at 1.) Modern timely filed an answer and counterclaim denying infringement and alleging invalidity of the patent. (Def.'s Answer and Countercl.)

In the fall of 1997, Defendant submitted its first request for reexamination to the Patent and Trademark Office (PTO) on the grounds that the claims of the '817 patent were obvious. The PTO denied Defendant's request for reexamination. (Pl.'s Resp. Mot. Stay at 1-2.) During the next few months, the parties engaged in extensive discovery which closed on July 30, 1998. *Id.* A trial date has been set for February 16, 1999. A Markman Hearing was scheduled for November 5, 1998, and was postponed pending the outcome of Defendant's Motion to Stay. *Id.* Several dispositive motions are also pending before this court. *Id.*

Although there is evidence in the record indicating that Defendant was aware of the prior art as early as May 5, 1998, [FN1] Defendant chose not to request a second reexamination of Plaintiff's patent until August 13, 1998, after dispositive motions by both parties were briefed and filed, a trial date was set, and two weeks after discovery had closed. On October 15, 1998, the PTO granted Defendant's second request for reexamination of the '817 patent. *Id.* at 3. Modern has now moved this court to stay this litigation pending the outcome of the reexamination proceeding and Plaintiff has filed a response to Modern's motion to stay.

FN1. There is also evidence which suggests that Defendant was aware of the prior art which forms the basis for its second request for reexamination as early as March 1998 when the Defendant received notice of a second lawsuit filed by Remington, for patent infringement, which disclosed some of the same prior art at issue in the present action. (Pl.'s Resp. Mot. Stay, Ex. 4 and Ex. 4A.)

II. DISCUSSION

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

A. Motion to Stay District Court Proceedings Pending Reexamination.

It is well settled that the decision to stay district court proceedings pending the outcome of a PTO reexamination proceeding "resides in the [sound] discretion of the district court." *Emhart Indus. Inc. v. Sankyo Seiki Mfg. Co.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987). In determining whether to grant or deny a stay, "courts consider whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party, whether a stay will simplify the issues in question and trial of the case, whether discovery is completed and whether a trial date has been set." *See Target Therapeutics Inc. v. SciMed Life Sys. Inc.,* 33 U.S.P.Q.2d 2022, 2023 (N.D.Cal.1995). While this court is cognizant of the advantages of granting the stay, this court finds that the many burdens associated with a stay outweigh the benefits.

1. Motion to Stay Would Not Be Judicially Efficient.

*2 The court agrees with Plaintiff that under the circumstances, granting the motion to stay would not be judicially efficient. Discovery has closed, a trial date has been set, and both parties have submitted dispositive motions which are presently pending before the court. (Pl.'s Resp. Mot. Stay at 2.) Finally, the Markman Hearing, originally scheduled for November 5, 1998, has already been postponed pending the outcome of Defendant's Motion to Stay. *Id.* Because a reading of the record suggests to the court that considerable monies have already been expended, staying the proceedings would only result in a waste of time and judicial resources, especially at this late stage of the litigation. *See Ascii Corp. v. STD Entertainment USA, Inc.,* 844 F.Supp. 1378, 1380 (N.D.Cal.1994) (Evidence that "substantial expense and time had been invested in the litigation [ ] would militate against granting the motion.").

In addition, other federal courts have declined to stay district court proceedings where discovery has been completed and a trial date has been set. *See Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516, 519 (E.D.Wash.1991) (denying plaintiff's motion to stay litigation where the parties had conducted extensive discovery and the case was set for trial); *Enprotech Corp. v. Autotech Corp.,* 15 U.S.P.Q.2d 1319, 1320 (N.D.Ill.1990) (finding that "[w]e are too far along the road to justify halting the

journey while the defendant explores an alternate route"); *Accent Designs Inc. v. Jan Jewelry Designs Inc.,* 32 U.S.P.Q.2d 1036, 1039- 40 (S.D.N.Y.1994);*Digital Magnetic Sys., Inc. v. Ansley,* 213 U.S.P.Q. 290 (W.D.Okla.1982) ("Parties should not be permitted to abuse the process by applying for reexamination after protracted, expensive discovery or trial preparation."). [FN2]

> FN2. The court also finds that a stay would be inappropriate because the average duration of a PTO reexamination proceeding is 19 months. (Pl.'s Resp. Mot. Stay, Ex. 2, PTO Data, at 3.)

Although Defendant contends, and the court does not disagree, that stays are to be liberally granted, the cases which have granted stays pending reexamination are easily distinguishable from the present action. Generally, courts grant stays where the case is in the early stages of litigation. *See Target Therapeutics,* 33 U.S.P.Q. at 2023 (Stay of proceedings is warranted where the action is in its early stages and the parties have not yet engaged in extensive discovery.); *accord Ascii,* 844 F.Supp. at 1381. Because this court finds the cases granting stays to be inapposite to the present matter, Defendant's reliance on these authorities is misplaced.

2. Stay of the Proceedings Would Be Unfairly Prejudicial to Plaintiff.

In ruling on a motion to stay proceedings, a court should consider whether a stay would unduly prejudice the non-moving party. *See United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991); *Wayne,* 782 F.Supp. at 519. In the present case, it is clear that Plaintiff will be prejudiced by staying the proceeding. Discovery has closed and a trial date has been set. In addition, the court is persuaded by Plaintiff's argument that since "a stay for reexamination could last for years ... [a]fter such a passage of time, Remington's prayer for relief to enjoin Modern from further infringement may no longer have value as technology or market conditions change." (Pl.'s Resp. Mot. Stay at 7.)

*3 The most compelling reason for denying the stay, however, is Defendant's unjustified delay in requesting a second reexamination with the PTO. Although Defendant maintains that the newly found

prior art, which forms the basis for its second reexamination petition, was just recently discovered, this court finds evidence to the contrary. The record indicates that Defendant was aware of the prior art as early as May 5, 1998, if not sooner, when Defendant deposed the inventor of the patent. (Pl.'s Resp. Mot. Stay at 2; Resp. Def.'s Mot. Leave Am. Answer & Countercl. at 4.) [FN3]

> FN3. It is arguable that Defendant had knowledge of this prior art as early as March 1998, when Plaintiff filed a second but related patent infringement lawsuit against Modern. In the second action, Plaintiff attached a copy of the '073 patent to the complaint, which included some of the prior art (i.e., Rodney patent) that Defendant now alleges Plaintiff should have disclosed to the PTO in its '817 patent application. Thus, Defendant was put on notice that the Rodney patent was relevant prior art in March 1998. (Pl.'s Resp. Mot. Stay at 2, Ex. 4 and Ex. 4A.) Finally, Defendant has failed to convince the court that it was not fully aware of the existence of this material prior to deposing patent attorney Donald Huntley on July 6, 1997. On July 1, 1998, in the second but related patent action, Defendant filed a motion to amend the answer and counterclaim to add the affirmative defense of inequitable conduct based upon Plaintiff's failure to disclose material prior art, despite the fact that it had not yet deposed Mr. Huntley. (Resp. Def.'s Mot. Leave Am. Answer & Countercl. at 4.) This strongly suggests that Mr. Huntley's testimony was not critical to Defendant's discovering the existence of this undisclosed prior art.

Generally, courts are reluctant to stay proceedings where a party is using the reexamination process merely as a dilatory tactic. *See Freeman v. Minnesota Mining and Mfg. Co.,* 661 F.Supp. 886, 887 (D.Del.1987) (denying a stay where defendant knew of the prior art for eight months yet delayed in filing its request for reexamination). Therefore, Defendant's unjustified delay in filing its reexamination petition weighs in favor of denying

the stay.

The PTO may ultimately conclude that in light of the undisclosed prior art, Plaintiff's patent is invalid. Even if this court, however, were to uphold the validity of the patent, it is well settled that "the two forums can quite correctly come to different conclusions regarding validity." *Whistler Corp. v. Dynascan Corp.,* 29 U.S.P.Q.2d 1866, 1872 (N.D.Ill.1993); *Output Tech. Corp. v. Dataproducts Corp.,* 22 U.S.P.Q.2d 1073-1074 (W.D.Wash.1991) ("[T]he Court and PTO have different functions and they are 'concepts not in conflict.' ").

While the court would surely benefit from the expert opinion of the PTO, [FN4] and while awaiting the outcome of the reexamination process could possibly eliminate the need for trial if the claims are canceled, prejudice to Plaintiff counsels strongly against granting the stay. Therefore, in its discretion, this court will deny Defendant's Motion To Stay pending reexamination.

> FN4. *See Bausch & Lomb Inc. v. Alcon Lab., Inc.,* 914 F.Supp. 951, 953 (W.D.N.Y.1996); *Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516, 518 (E.D.Wash.1991); *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (finding that the PTO's expertise in construing the validity of a patent is a factor which weighs heavily in favor of granting a stay pending reexamination).

III. CONCLUSION

For the reasons stated above, the court will deny Defendant's Motion To Stay District Court Proceedings Pending Reexamination.

An order in accordance with this memorandum opinion shall be filed contemporaneously herewith.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

## CONCLUSION

[3] In light of the weakness of Visa's mark, the substantial differences between the two marks, the fact that they are not in direct competition, and the lack of significant evidence of actual confusion,[4] we conclude that Visa has not established a probability of success on the issue of likelihood of confusion, or even serious questions going to the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1420 [223 USPQ 227] (9th Cir. 1984) (a "serious question" is "one as to which the moving party has a fair chance of success on the merits."). We therefore affirm the district court's denial of Visa's motion for a preliminary injunction.

---

### District Court, D. Delaware

Rohm and Haas Co. v. Brotech Corp.

No. 90–109 (RRM)

Decided July 16, 1992

## PATENTS

**1. Practice and procedure in Patent and Trademark Office — Re-examination — In general (§110.1501)**

## JUDICIAL PRACTICE AND PROCEDURE

**Procedure — Stays — In general (§410.2901)**

Continued stay of patent infringement action pending completion by Patent and Trademark Office of re-examination, requested by third party, of one of patents in suit is not warranted, in view of indication from PTO that at least some claims will survive re-examination, since lifting stay would ensure relatively prompt trial at time when there is substantial probability that PTO will have completed re-examination, since stay does not serve objectives of Patent Act of 1980, in that re-examination probably will not resolve parties' disputes and will not have substantial impact on reducing costs of litigation, and since lifting stay would promote Civil Justice Reform Act's goal of promoting just, speedy, and inexpensive resolution of disputes.

**Particular patents — Chemical — Polymerization**

4,224,415, Meitzner and Oline, polymerization processes and products therefrom, stay of infringement action pending completion of re-examination proceeding lifted.

---

Action by Rohm and Haas Co. against Brotech Corp. for patent infringement. On plaintiff's motion to lift stay of proceedings. Motion granted.

Rudolf E. Hutz, N. Richard Powers, and Jeffrey B. Bove, of Connolly, Bove, Lodge & Hutz, Wilmington, Del.; William E. Lambert, III, Philadelphia, Pa., for plaintiff.

Robert K. Payson, of Potter, Anderson & Corroon, Wilmington; Raphael V. Lupo and Jack Q. Lever, Jr., of Willian, Brinks, Olds, Hofer, Gilson & Lione; Herbert B. Keil, of Keil & Weinkauf, Washington, D.C.; Paul R. Rosen and Niels Korup, of Spector, Gadon & Rosen, Philadelphia, for defendant.

McKelvie, J.

This is a patent case. Rohm and Haas Company ("Rohm and Haas") alleges Brotech Corporation ("Brotech") is infringing four of its patents relating to ion exchange resins or adsorbents.

In March of this year, the Judge previously assigned to this case granted Brotech's motion to stay the proceedings pending completion of the Patent and Trademark Office's ("PTO") reexamination of one of the patents. Thereafter, this case was reassigned to me and Rohm and Haas requested that the stay be lifted. For the following reasons, the Court will grant the request, lift the stay, and schedule the case for trial.

### 1. *Nature and Stage of the Proceedings*

Rohm and Haas filed this action in March of 1990. It alleges Brotech is infringing four of its patents, Nos. 4,224,415 ("'415"), 4,256,840 ("'840"), 4,382,124 ("'124") and 4,818,733 ("'773"). The '415, '840 and '124 patents were invented by Erich Meitzner and James Oline, former Rohm and Haas employees. These patents relate to

---

[4] Visa concedes that the fifth factor, Eastern's intent, does not support a finding of likelihood of confusion in this case.

macroeticular cross-linked copolymer beads and adsorbants, ion exchange resins made from them, and their preparation. Rohm and Haas acquired rights under the fourth patent, '773, through the acquisition of Diamond Shamrock in the mid-1980's. It relates to specially synthesized alkylaminophosphonic chelating resins, the process of making such ion exchange resins, and the methods for using them.

These ion exchange resins or adsorbants are used for water softening and deionization, sugar refining, waste treatment, chemical analysis and a number of other applications. Macroreticular ion exchange resins or adsorbants give fast ion exchange, have low resistance to fluid flow, give good strength and rigidity, allow only small volume changes in various solvents and have an improved resistance to oxidation and shock.

The Court has entered a series of scheduling orders in the case. The most recent order provided for a cut-off of fact discovery in April of this year and a non-jury trial beginning in October.

In September of 1991, a law firm filed a request with the PTO for a reexamination of the '415 patent pursuant to 35 U.S.C. §§ 301-307. The firm filed the request on behalf of an undisclosed client, an anonymous third party requestor. The request alleged, among other things, that the '415 patent is anticipated by, or obvious in view of, a patent previously issued to Clarke.

In November of 1991, the PTO granted reexamination of the '415 patent on the basis that the Clarke patent raises a substantial new question of patentability as to claims 1, 2, and 4 through 12 of the patent.

In December of 1991, Brotech moved to stay this litigation. In its motion, Brotech argued that the Court should exercise its discretion to stay the case pending the outcome of the reexamination, as it was likely the PTO would invalidate or narrow the scope of the '415 patent and, by extension, the '840 and '124 patents.

In March of 1992, the Judge previously assigned to this case granted that motion and entered an order staying the proceedings pending completion of the reexamination. She found that the technical expertise to be gained by a PTO decision, which may clarify the issues with regard to discovery and ultimately for trial, weighed toward deferring to the reexamination procedure. She concluded that the benefits to be gained by staying the litigation pending reexamination outweighed the detrimental effects of a delay in the resolution of the litigation. She further noted that the Court could lift the stay at any time the Court finds it no longer appropriate.

This case was reassigned to me on March 31, 1992. On May 22nd, Rohm and Haas filed a status report on the reexamination and reported that, in a first office action, the PTO had found claims 3 and 10 of the '415 patent to be patentable over the prior art. It rejected claims 1, 2, 4, 5 through 9, 11 and 12 under 35 U.S.C. §§ 102(b) and 103, as either anticipated by or unpatentable over Clarke. With that report, Rohm and Haas requested that the Court lift the stay.

The Court reviewed the request to lift the stay at a June 25th status conference. At that conference, Rohm and Haas' counsel reported that claims 3 and 10 of the '415 patent cover all of Brotech's ion exchange resin products that are at issue insofar as the '415 patent is concerned and argued that the litigation would, therefore, go forward in any event at the completion of the reexamination. As to the balance of the claims of the '415 patent, counsel reported that Rohm and Haas had requested a reconsideration of the initial action and, in late June, the Examiner had indicated in an interview claims 6 through 9, 11, and 12 are deemed to be patentable.

Counsel for Brotech argued that nothing had really changed since the Court had previously granted the stay. "Until the Patent Office says this is final, and until it goes out the door with a certificate of reexamination, anything can happen to those claims." Docket Item ("D.I.") 364 at 14. In opposing a lifting of the stay, he estimated that the reexamination process could take twelve to eighteen months from start to finish. D.I. 364 at 15. (As the PTO granted reexamination in November of 1991, this suggests the process will be completed between November of 1992 and May of 1993).

### 2. *Review of the Decision to Stay the Case*

At the status conference, counsel for Brotech cited *Geibel v. United States*, 667 F. Supp. 215 (W.D.Pa. 1987), *aff'd*, 845 F.2d 1011 (3d Cir. 1988) and *Schultz v. Onan Corp.*, 737 F.2d 339 (3d Cir. 1984) for the proposition that the decision and order staying the case was the law of the case and could be set aside only if this Court found it clearly erroneous. This argument appears to be inconsistent with the arguments Brotech made in urging the Court to exercise its discretion to grant a stay. "Just as the Court has inherent discretionary power to order a stay of litigation pending reexamination, *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 [217 USPQ 985] (Fed. Cir. 1983), the Court has the power to lift or otherwise modify the stay if, in the Court's opinion, a stay is no longer warranted. . . . "[I]t is absurd to sug-

gest that this Court would lose jurisdiction and control over the litigation before it." Brotech's Reply Brief in Support of its Motion for a Stay. D.I. 309 at 8.

Rohm and Haas' request to lift the stay is not a request that the Court modify or change the law of the case. Rather, it is a request that the Court reexamine the factual and procedural circumstances to determine whether maintaining the stay is appropriate.

### 3. *Facts and Circumstances That Suggest the Stay Should be Lifted*

[1] There are two sets of facts and circumstances the Court has looked to in determining that the stay should be lifted. First, the information from the PTO confirms that at least some of the claims will survive reexamination. We know that those claims probably will have to be resolved in this litigation. With the current status of the Court's calendar, if we put the case back on track for trial, the trial would be scheduled to commence in approximately ten months, or May of 1993. Lifting the stay would ensure a relatively prompt trial at a time when there is a substantial probability that the PTO will have completed its reexamination. The advantages of setting a date certain for a trial that will probably have to go forward outweigh the disadvantages of the uncertainty of the impact that the reexamination may have and the added expense the parties may incur in preparing the case for trial while the reexamination proceeds.

The second set of facts and circumstances that suggest the stay should be lifted relate to the Civil Justice Reform Act of 1990, by which Congress has attempted to address the problems of the costs and delays in our courts. *See* 28 U.S.C. § 471 note (Supp. 1992).

That Act provides that each United States district court shall develop a civil justice expense and delay reduction plan that shall consider and may include six principles and guidelines of litigation management to reduce costs and delays in litigation. They are: (1) a systematic, differential treatment of civil cases that tailors the level of individualized and case specific management to the nature of the case; (2) early and ongoing judicial involvement that includes, *inter alia*, setting early, firm trial dates that occur within eighteen months after the filing of the complaint; (3) careful and deliberate monitoring of cases through case-management conferences; (4) encouraging cost-effective discovery; (5) requiring that discovery motions include a certification that counsel has made a good faith effort to resolve the mat-

ter; and (6) referring certain cases to alternative dispute resolution programs. *See* 28 U.S.C. § 473 (Supp. 1992).

Delaware has been designated under the Act as one of the districts responsible for developing a pilot program to implement an expense and delay reduction plan that will be reviewed and evaluated in a report the Judicial Conference is to submit to the Committees on the Judiciary of the Senate and House of Representatives no later than December 31, 1995. *See* 28 U.S.C. § 471 note (Supp. 1992). Pursuant to that designation, and with the assistance of a local advisory committee, the court has developed and adopted a plan and is in the process of amending its local rules consistent with that plan. *See* 28 U.S.C. § 471 note and § 478 (Supp. 1992). With the addition of a fourth active judge to the court at the end of March of 1992, and the development of proposed amendments to the local rules, the court is now moving to implement that plan.

From the Court's perspective, a primary theme of the plan is that we can reduce the costs and delays in litigation by working to shorten the time period from the date of filing of the complaint to the final disposition of the matter. With active case management and a goal of having cases tried within twelve months from the date of the filing, we can work to secure the just, speedy, and inexpensive determination of every action. *See* Fed. R. Civ. P. 1.

There is some question as to how our plan and this approach will work in patent cases, not just because counsel and the parties may see them as complex, but also because of procedural problems that may be unique to patent cases. One example of that type of problem is the reexamination process, which has the potential to delay cases for eighteen months.

The legislative history of The Patent Act of 1980 suggests that Congress established the patent reexamination procedure in an attempt to accomplish some of the very same goals it identified in the Civil Justice Reform Act. *See e.g.*, H.R. Rep. No. 1307, 96th Cong., 2nd Sess. 1 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6462-63 ("Reexamination will permit efficient resolution of questions about the validity of issued patents without recourse to expensive and lengthy infringement litigation. . . . A new patent reexamination procedure is needed to permit the owner of a patent to have the validity of his patent tested in the Patent office where the most expert opinions exist and at a much reduced cost. . . . The reexamination of issued patents could be conducted with a fraction of the time and cost of formal legal

*Aqua Bay Concepts Inc. v. Grosse Point Board of Realtors*          24 USPQ2d

proceedings and would help restore confidence in the effectiveness of our patent system.")

The statistical information available on the procedure shows that the average time for the completion of a reexamination is approximately 18.2 months. PTO, *Reexamination Filing Data,* Mar. 31, 1991, at 3 (D.I. 306 at Attachment C). When the Patent Office orders reexamination, all claims were confirmed in approximately 24% of the cases, all claims were canceled in approximately 12% of the cases, and some claims were changed in approximately 64% of the cases. *Id.*

These statistics suggest that in a typical case there is a substantial probability a reexamination will have a major impact on the issues to be resolved in the litigation, but that despite the PTO's steps to ensure special dispatch in reexamination, if a court stays litigation pending reexamination, the stay may add eighteen months to the time for the resolution of the case.

In this case, certain factors suggest that a stay does not serve the objectives of The Patent Act of 1980. For example, if a purpose of the statute is to provide an inexpensive method for the patent owner to test the validity of its patent, that interest is not being served here. First, the reexamination has been initiated at the request of an anonymous person, rather than the patent owner. Second, the reexamination probably will not resolve the disputes between the parties. Third, in light of the nature and extent of the litigation to date, it does not appear that the reexamination will have a substantial impact on reducing the costs of the litigation.

The added factor of the experimental nature of the court's role as a pilot district under the Civil Justice Reform Act also suggests that the stay should be lifted. During this period when we are testing and evaluating our plan to see if it can help solve the problems Congress has identified, the court should be prepared to see if the experiment works on as broad a spectrum of cases as possible. It may be that the court and others will conclude in a few years that the approach the court has taken in the plan will have to be modified in certain types of cases, such as this one. On the other hand, we may find that for parties such as we have here, with a dispute of this nature, a stay for reexamination tends to defeat, rather than accomplish the goal of a just, speedy, and inexpensive determination of the dispute.

The Court will enter an order lifting the stay and setting the case for trial.

**District Court, E.D. Michigan**

Aqua Bay Concepts Inc. v. Grosse Point Board of Realtors

No. 91-CV-74819

Decided May 7, 1992

## COPYRIGHTS

**1. Elements of copyright — Federal preemption — Statutory pre-emption (§205.0803)**

Plaintiff's unfair competition claim arising from defendants' alleged "conspiracy" and "deception" in using, copying, and selling plaintiff's copyrighted city map is preempted pursuant to Copyright Act's Section 301, 17 USC 301, since such unfair competition claims fail to qualitatively alter nature of litigation to sufficiently distinguish such claims from infringement claims; plaintiff's claims for tortious interference with contractual relationship and its state law civil conspiracy claim are also pre-empted.

Action by Aqua Bay Concepts Inc. against Grosse Point Board of Realtors, et al., for copyright infringement, unfair competition, and state tort law violations. On defendants' motion to dismiss unfair competition and state tort law claims as pre-empted. Motion granted.

Peter W. Macuga, of Tannian & Associates, Detroit, Mich., for plaintiff.

Samuel D. Littlepage, Gregory L. McClelland, and Gail A. Anderson, of Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit; Sally Lee Folly, of Harness, Dickey & Pierce, Detroit, for defendants.

Cook, C.J.:

On September 19, 1991, the Plaintiff, Aqua Bay Concepts, Inc. d/b/a St. Clair Map Company (Aqua Bay), initiated this copyright infringement action against the Defendants[1] pursuant to the Copyright Act

---

[1] There are thirty-seven named and unnamed Defendants in this action. They include Grosse Point Board of Realtors, John Doe Printing Co. I., Jane Doe Typesetting Co. I, Travel Graphics of Michigan, John Doe Printing Co. II., John Doe Typesetting Co. II., Travel Graphics Int'l, John Doe Printing Co. III., Jane Doe Typesetting Co. III.; Michigan Multilisting Service Inc., Joe Doe Printing Co. IV., Jane Doe Typesetting Co. V., Shorewood Real Estate, Inc., John Doe Printing Co. VI., Jane Doe Typesetting VI., Champion & Baer, Inc., Youngblood & Finn Realtors Better Homes and Gardens, The Prudential Grosse Pointe Real Estate Co., Bolton-Johnson Associates of Grosse Points, Coldwell Banker Schweitzer Real Estate-18780 Mack Avenue., Coldwell Banker Schweitzer Real Estate-21300 Mack